**No. 22-16870**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

PURUSHOTHAMAN RAJARAM,

*Plaintiff-Appellant*,

v.

META PLATFORMS, INC.

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:22-cv-02920-LB
Magistrate Judge Laurel Beeler

**APPELLANT'S OPENING BRIEF**

Daniel Low
Daniel Kotchen
KOTCHEN & LOW LLP
1918 New Hampshire Ave. NW
Washington, DC 20009
dlow@kotchen.com
dkotchen@kotchen.com

*Attorneys for Plaintiff-Appellant
Rajaram*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 3

STATUTORY AUTHORITIES ............................................................. 4

ISSUE PRESENTED ......................................................................... 4

STATEMENT OF THE CASE .............................................................. 5

    I.    Meta's Preference for Visa Workers Over U.S. Citizens........ 5

    II.   Plaintiff Rajaram Was Repeatedly Rejected by Meta Despite His Qualifications. ................................................................ 8

    III.  Dismissal by the Lower Court. ............................................ 11

SUMMARY OF THE ARGUMENT ...................................................... 12

STANDARD OF REVIEW ................................................................. 15

ARGUMENT ................................................................................... 16

    I.    The Statutory Language of § 1981 Protects "All Persons," Not Only "Aliens." ............................................................. 17

    II.   Legislative History Demonstrates That Congress Intended § 1981 to Apply to Reverse Citizenship Discrimination. ........ 24

    III.  Public Policy Supports Including U.S. Citizens in § 1981's Protections. ...................................................................... 33

    IV.  All Prior Decisions Within This Circuit Found That § 1981 Applies to Reverse Citizenship Discrimination. ................... 37

V.    The Reasoning of the Lower Court and Cases Relied on by the Lower Court Are Not Persuasive. .................................... 40

CONCLUSION ........................................................................... 52

STATEMENT OF RELATED CASES ...................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Conboy*, 156 F.3d 167 (2d Cir. 1998) ................ 19, 28, 31, 51

*ASARCO LLC v. Celanese Chem. Co.*, 792 F.3d 1203 (9th Cir. 2015) ... 15

*Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731 (5th Cir. 1986) ...................................................................................... passim

*Chattopadhyay v. BBVA USA*, No. 21-15017, 2021 WL 4958850 (9th Cir. Oct. 26, 2021) .................................................................. passim

*Cleveland v. City of L.A.*, 420 F.3d 981 (9th Cir. 2005) ......................... 24

*Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176 (1980) ........ 33, 34

*Deravin v. Kerik*, 335 F.3d 195 (2d Cir. 2003) ....................................... 44

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006) ................................... 17

*Duane v. GEICO*, 37 F.3d 1036 (4th Cir. 1994) .............................. passim

*Georgia v. Rachel*, 384 U.S. 780 (1966) .................................................. 23

*Gomez v. Thrive Lifestyle Servs., LLC*, No. 3:12-CV-00766, 2014 WL 4631201 (D. Or. Sept. 15, 2014) ................................................. 14, 37

*Graham v. Richardson*, 403 U.S. 365 (1971) .................................. passim

*Hamdi v. U.S Citizenship & Immigr. Servs.*, No. EDCV 10-894, 2012 WL 632397 (C.D. Cal. Feb. 25, 2012) ............................................. 40

*Haro v. City of L.A.*, 745 F.3d 1249 (9th Cir. 2014) ............................... 24

*Hernandez v. Siri & Son Farms, Inc.*, No. 6:20-CV-00669, 2021 WL 4999022 (D. Or. Sept. 30, 2021) ............................................... passim

*Hollander v. Sears, Roebuck & Co.*, 392 F. Supp. 90 (D. Conn. 1975) ... 24

*In re De Laurentiis Entm't. Grp., Inc.*, 124 B.R. 305 (C.D. Cal. 1991) .. 33, 34

*Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078 (D. Ariz. 2010) ...................................................................................... passim

*Johnston v. Regal Entm't. Grp.*, 787 F. App'x 413 (9th Cir. 2019)......... 15

*Jones v. First Nat'l Bank of Ariz.*, No. CV-09-2384, 2010 WL 2491617
    (D. Ariz. June 17, 2010) ................................................................ 38

*Juarez v. Soc. Fin., Inc.*, No. 20-CV-03386-HSG, 2021 WL 1375868
    (N.D. Cal. Apr. 12, 2021) .............................................................. 25

*Maack v. Wyckoff Heights Med. Ctr.*, No. 15 Civ. 3951, 2016 WL
    3509338 (S.D.N.Y. June 21, 2016)........................................... 47, 48

*Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968 (10th Cir. 1979) ..... 24

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976) ..... passim

*McDonald v. Sun Oil Co.*, 548 F.3d 774 (9th Cir. 2008)........................ 17

*Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39
    (S.D.N.Y. 2020) .......................................................................... 47, 49

*Molerio v. FBI*, 749 F.2d 815 (D.C. Cir. 1984)........................................ 44

*Murillo v. Servicios Agricolas Mex, Inc.*, No. CV-07-2581, 2012 WL
    1030084 (D. Ariz. Mar. 27, 2012)............................................ 15, 37

*Novak v. World Bank*, No. 79-0641, 1979 WL 225 (D.D.C. June 13, 1979)
    .................................................................................................... 45

*Nw. Forest Res. Council v. Glickman*, 82 F.3d 825 (9th Cir. 1996) ....... 19

*Ortiz v. Bank of Am.*, 547 F. Supp. 550 (E.D. Cal. 1982)........................ 23

*Rios v. Marshall*, 530 F. Supp. 351 (S.D.N.Y. 1981).............................. 19

*Runyon v. McCrary*, 427 U.S. 160 (1976) ......................................... 25, 28

*Sagana v. Tenorio*, 384 F.3d 731 (9th Cir. 2004) ........................... passim

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) 17, 40

*Sprint PCS Assets, L.L.C. v. City of La Canada Flintridge*, 448 F.3d
    1067 (9th Cir. 2006) ..................................................................... 34

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948)... 16, 28, 36, 39

*Thomas v. Rohner-Gehrig & Co.*, 582 F. Supp. 669 (N.D. Ill. 1984) 38, 44

*Tomason v. Stanley*, No. 6:13-cv-42, 2013 WL 5652040 (S.D. Ga. Oct. 16,
    2013)............................................................................................ 50

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977)................... 31

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) ........................ 25

*United States v. Richard Dattner Architects*, 972 F. Supp. 738
    (S.D.N.Y.1997).............................................................................. 38

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) ................ 33

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898)...................... 22, 32

*Vaughn v. City of N.Y.*, No. 06-cv-6547, 2010 WL 2076926 (E.D.N.Y.
    May 24, 2010) ........................................................................ 46, 49

*Whitman v. Mineta*, 541 F.3d 929 (9th Cir. 2008) ................................ 15

**Statutes**

28 U.S.C. § 1291 ...................................................................................... 4

28 U.S.C. § 1331 ...................................................................................... 3

28 U.S.C. § 1332 ...................................................................................... 3

29 U.S.C. § 206 ...................................................................................... 46

42 U.S.C. § 1981 ............................................................................. passim

8 U.S.C. § 1324 ................................................................................. 8, 46

Chinese Exclusion Act of 1882, Pub. L. 47-126 (1882) ......................... 45

Civil Rights Act of 1866, 14 Stat. 27 (1866) ........................................ 30

Civil Rights Act of 1870, 16 Stat. 140 (1870) ....................................... 31

**Other Authorities**

Cong. Globe, 39th Cong., 1st Sess. (1866) ..................................... passim

Cong. Globe, 41st Cong., 2d Sess. (1870).............................. 29, 30, 33, 51

**Rules**

Fed. R. App. P. 4 ...................................................................................... 4

Fed. R. Civ. P. 41 ................................................................................... 43

**Treatises**

Kenneth M. Geisler II, *Fissures in the Valley: Searching for a Remedy for U.S. Tech Workers Indirectly Displaced by H-1B Visa Outsourcing Firms*, 95 Wash. U. L. Rev. 465 (2017) ..................... 34

Naomi Schoenbaum, *The Case for Symmetry in Antidiscrimination Law*, 2017 Wɪs. L. Rᴇv. 69 (2017) ........................................... 35

Rachel Bloomekatz, *Rethinking Immigration Status Discrimination and Exploitation in the Low-Wage Workplace*, 54 UCLA L. Rev. 1963 (2007) .................................................................... 33, 35

**Regulations**

20 C.F.R. § 655.731 .................................................................... 6

## INTRODUCTION

This case presents a purely legal question of statutory interpretation: Does 42 U.S.C. § 1981—which controlling case law has held to prohibit racial discrimination, reverse racial discrimination against whites, and citizenship discrimination against aliens—prohibit reverse citizenship discrimination against U.S. citizens?

Plaintiff-Appellant Purushothaman Rajaram alleges that Defendant-Appellee Meta Platforms, Inc. ("Meta") discriminated against him and other U.S. citizens in favor of foreign visa workers in hiring in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"). Every district court within this circuit to address the issue had found that § 1981 applies to reverse citizenship discrimination against U.S. citizens. The magistrate judge below, however, reached the opposite conclusion and dismissed the claim.

Section 1981 explicitly protects "[a]ll persons" from the types of discrimination prohibited under § 1981—race and citizenship, with nothing in the text of the statute suggesting that its protections should be limited to non-citizens. And the legislative history reflects that

Congress intended for § 1981 to be applied broadly, including to citizens and to claims of reverse discrimination.

The Supreme Court previously held that § 1981 extends to claims of reverse racial discrimination, and its reasoning in that case applies equally to claims of reverse citizenship discrimination. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 285-96 (1976) (basing its decision primarily on the broad "[a]ll persons" statutory language and legislative history).

In the lower court decision, the magistrate judge did not analyze or attempt to distinguish the statutory language, or the legislative history discussing the broad purpose of the law. Nor did the lower court distinguish *McDonald*, or the *McDonald* court's reasoning. Instead, the magistrate judge relied on out-of-circuit decisions to conclude that § 1981 protects primarily against racial discrimination, and that "race" is interpreted to extend to alien status, but not U.S. citizen status. The court also relied on what it deemed to be the "weight of authority," but the authorities cited were all out-of-circuit decisions that were poorly reasoned, including several that addressed the issue only in *dicta*.

Plaintiff Rajaram represents a proposed class of U.S. citizens who allege that Meta discriminates in its hiring decisions in favor of foreign visa workers. Rajaram alleges that Meta prefers to hire and staff visa workers (primarily H-1B workers) in U.S. roles because it can pay them less than their American counterparts who demand higher salaries, which is contrary to H-1B visa law. The U.S. Department of Justice previously found reasonable cause to believe that Meta had engaged in a pattern-or-practice of citizenship discrimination. And there is a large statistical disparity in the portion of Meta's workforce that is composed of non-U.S. citizens compared to the total U.S. workforce. Rajaram is a naturalized U.S. citizen from India who applied for multiple positions with Meta from May 2020 forward, and on each occasion, was denied employment despite being well-qualified.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(a) and (d) over this federal class action employment discrimination case, which was brought under 42 U.S.C. § 1981.

The district court granted a motion to dismiss and entered judgment on November 10, 2022. Plaintiff Rajaram timely filed his Notice of Appeal on December 6, 2022. ER-111–113; Fed. R. App. P. 4(a)(1)(A). Accordingly, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATUTORY AUTHORITIES

Title 42 U.S.C. § 1981(a) states:

> **(a)   Statement of equal rights**
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

## ISSUE PRESENTED

I.   Whether the magistrate judge erred in holding that § 1981 does not apply to claims of reverse citizenship discrimination, where: the statute broadly protects "[a]ll persons," and not just non-citizens; the legislative history indicates that the statute protects citizens and protects against reverse discrimination; and the Supreme Court's *McDonald* decision is controlling where it

4

interpreted the same statutory language (in the context of racial discrimination) as applying to reverse discrimination.

## STATEMENT OF THE CASE

Plaintiff Rajaram represents a proposed class of U.S. citizens who applied for but were denied employment with Meta. Rajaram brought a single claim, for reverse citizenship discrimination under § 1981.

## I. Meta's Preference for Visa Workers Over U.S. Citizens.

Meta is an American technology conglomerate that has created or acquired products that allow users to connect and share content with each other through mobile and in-home devices and computers. ER-98 ¶ 1. Its most popular products include Facebook, Instagram, Messenger, and WhatsApp. ER-98–99 ¶ 1. Meta had almost 35,000 employees in the U.S. as of 2019, and each year hires a significant number of information technology ("IT") workers. ER-99 ¶ 1.

Rajaram alleges that Meta prefers to hire and staff non-U.S. citizens, typically H-1B visa workers, in U.S. roles, as it can pay these individuals less than their American counterparts who demand higher salaries. ER-99 ¶ 2. H-1B visas are intended to bring foreign workers to the United States to perform services in specialty occupations when there

5

are insufficient workers in the U.S. to perform a specific job. ER-101 ¶ 14. By law, H-1B visa workers must be paid by their employer at least as much as other employees with similar experience and qualifications for the specific employment in question. *Id.* (citing 20 C.F.R. § 655.731(a)).

Over the past nine years, Meta secured over 20,000 H-1B visas (including new visas, visa extensions, and visa amendments) for its U.S. workforce, with the number of H-1B visa approvals increasing each year. ER-101–102 ¶ 15. The vast majority of these visas are secured for employees who will perform software engineer roles in the United States. ER-102 ¶ 15.

Meta also contracts with third-party IT consulting vendors that provide Meta with visa workers who work out of Meta's U.S. offices. ER-102 ¶ 16. While the consulting companies sponsor visas for these contractors, Meta interviews them, maintains control over their hiring and termination, and supervises their day-to-day work. *Id.*

Meta is an H-1B visa dependent employer, meaning that more than 15% of its U.S. workforce is on an H-1B visa. ER-102 ¶ 15. There were approximately 583,420 H-1B visa workers in the U.S. as of September

6

2019, ER-99 ¶ 2 n.2, out of a total U.S. workforce of approximately 157.53 million in 2019,[1] such that H-1B visa workers constituted approximately 0.37% of the total U.S. workforce. Because Meta's workforce consists of over 15% H-1B visa workers, H-1B workers are found among Meta's workforce over 40 times more frequently than the U.S. workforce as a whole.

The U.S. Department of Justice ("DOJ") previously settled a lawsuit against Meta in which DOJ found reason to believe that Meta unlawfully discriminated against U.S. citizens in hiring. ER-103–104 ¶ 19. In December 2018, the DOJ's Immigrant and Employee Rights Section within the Civil Rights Division launched an investigation into whether Meta engaged in unfair recruitment and hiring practices based on citizenship. ER-102 ¶ 17. After a two-year investigation, DOJ notified Meta that it had "found reasonable cause to believe that [Meta] had engaged in a pattern or practice of unfair immigration-related

---

[1] Employment in the United States from 2013 to 2023, STATISTA (last accessed Feb. 2, 2023), *available at* https://www.statista.com/statistics/269959/employment-in-the-united-states/.

employment practices violating 8 U.S.C. § 1324(b)(a)(1)," which prohibits discrimination based on an individual's citizenship status. ER-102–103 ¶ 17. DOJ then filed a complaint against Meta on December 3, 2020 alleging that Meta intentionally discriminates against U.S. workers because of their citizenship or immigration status by failing to recruit, consider, or hire these workers for permanent positions that it earmarks for visa-holding employees for hiring through a permanent labor certification ("PERM"). ER-103 ¶ 18. Specifically, DOJ alleged that Meta declined to consider U.S. workers for 2,606 positions that it reserved for PERM-related hiring of visa holders. *Id.* In October 2021, Meta entered into a $14.25 million settlement, and Meta agreed not to discriminate in hiring or recruitment on the basis of citizenship or immigration status. ER-103 ¶ 19. Most of Meta's PERM applications were filed for software engineer positions. ER-104 ¶ 21.

## II. <u>Plaintiff Rajaram Was Repeatedly Rejected by Meta Despite His Qualifications.</u>

Plaintiff Rajaram is a highly skilled IT professional who specializes in solution architecting and delivering enterprise Product Lifecyle

Management[2] ("PLM") software solutions.  ER-104 ¶ 22.  He has a bachelor's degree in engineering and a diploma in mechanical engineering.  *Id.*  He has almost twenty years of relevant experience, working in both full-time employee and consultant roles. *Id.*  Rajaram is a naturalized U.S. citizen who resides in Pennsylvania. ER-99 ¶ 4.

Rajaram was considered for employment with Meta on multiple occasions from May 2020 forward but was rejected each time because of Meta's discriminatory preference for visa holders. ER-104 ¶ 23.

In May 2020, Rajaram was recruited by a third-party vendor for Meta regarding a PLM Architect position with Meta. ER-105 ¶ 24. Rajaram expressed interest in the role and submitted a copy of his resume which listed his citizenship status (which is also available on his LinkedIn page). *Id.* Rajaram performed well in his interview with the vendor, and was told by the interviewers that he was the "right guy" and "perfect" for the role." ER-105 ¶ 25.  Rajaram then interviewed with a Meta employee whom Rajaram believes to be working for Meta in the

---

[2] A typo in the Complaint refers to PLM as Product Lifestyle Management.  ER-104 ¶ 22.

U.S. on an H-1B visa. ER-105 ¶ 26. After the interview, Meta declined to hire Rajaram despite Rajaram performing well in the interview and being well qualified for the role. *Id.*

In June 2020, a PLM Analyst at Meta referred Rajaram for a full-time PLM Analyst position with the company, and shared Rajaram's resume (listing his citizenship status) with Meta. ER-105 ¶ 27. Rajaram was then interviewed by Meta. *Id.* Rajaram shared his PLM experience in detail, and received positive feedback, was told that Meta was very interested in his candidacy, and that he would be presented to the team in charge of hiring for the role. *Id.* However, despite Rajaram's qualifications and strong interview performance, he was informed that the team had decided not to move forward with his application. ER-105–106 ¶ 27. On information and belief, the PLM Analyst role was ultimately filled by an H-1B visa holder. ER-106 ¶ 27.

In March 2022, Rajaram applied to Application Manager and PLM positions with Meta on its career website that he was well qualified for. ER-106 ¶ 28. The resume Rajaram submitted noted that he is a naturalized U.S. citizen. *Id.* Meta failed to contact, interview, or hire Rajaram. *Id.*

Finally, over the past few years, Rajaram has applied to a variety of PLM roles with Meta in Menlo Park, CA and Austin, TX. ER-106 ¶ 29. Despite his strong PLM qualifications and experience, Meta never contacted Rajaram regarding his applications, and failed to hire him for PLM Manager, PLM Project Manager, and PLM Architect roles that he applied for. *Id.*

In each instance, Meta failed to hire Rajaram because of his citizenship and the company's preference for H-1B visa holders. ER-106 ¶ 30.

### III.   <u>Dismissal by the Lower Court.</u>

On May 17, 2022, Rajaram filed a class action suit against Meta under § 1981. Dkt. #1.  The operative First Amended Complaint ("FAC") was filed on June 27, 2022. ER-98.  The parties consented to a magistrate judge conducting all proceedings in the trial court.  Dkts. #8, 15.

Meta filed a motion to dismiss the FAC on August 29, 2022.  ER-74. Magistrate Judge Laurel Beeler held an oral argument lasting under ten minutes on November 10, 2022.  ER-15–23.   The same day as oral argument, the magistrate judge issued an order granting the motion to dismiss and entered final judgment for Meta.  ER-4; ER-3.

In granting the motion to dismiss, the magistrate judge did not analyze the statutory text of § 1981 and made only one cursory reference to legislative history. The court discounted the decisions of district courts within the Ninth Circuit, and instead cited out-of-circuit decisions in finding that "[m]ost courts hold that U.S. citizens are not a protected class," and "follow[ed] this authority as persuasive," even though the cited cases addressed the issue only in *dicta* or otherwise addressed the issue in only a cursory and flawed manner. ER-12. The court found that "[t]hese cases illustrate that § 1981 protects primarily against racial discrimination and that 'race' is interpreted broadly and extends to alien status (that is, non-U.S. citizen status)." ER-14.

Rajaram timely filed a notice of appeal on December 6, 2022. ER-111.

## SUMMARY OF THE ARGUMENT

The Court should reverse the dismissal of this case and remand to the district court for further proceedings because the district court erred in holding that § 1981 does not apply to claims of reverse citizenship discrimination.

First, the broad statutory text of § 1981 protects "[a]ll persons" from prohibited discrimination, which necessarily includes citizens. 42 U.S.C. § 1981(a). The words "alien" or "non-citizen" appear nowhere in the statute. 42 U.S.C. § 1981. Rather, the statute provides to "[a]ll persons" the same contractual rights as "white citizens," *id.*, where the "white citizens" language emphasizes the nature of the rights being protected, *i.e.*, race and citizenship. 42 U.S.C. § 1981(a); *McDonald*, 427 U.S. at 287 (race); *Sagana v. Tenorio*, 384 F.3d 731, 738 (9th Cir. 2004) (citizenship status). Thus, the statutory text reflects that § 1981 encompasses a broad protected class and applies to reverse discrimination. Because there are no ambiguities in the statutory language, the text of the statute is dispositive. To the extent that there is any ambiguity in the statute, the Supreme Court has already construed the same language, and its interpretation is controlling. *McDonald*, 427 U.S. at 287 (holding that the statutory text shows that § 1981 applies to reverse racial discrimination); *Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078, 1086-87 (D. Ariz. 2010) (following the *McDonald* ruling in applying § 1981 to reverse citizenship discrimination).

Second, the legislative history further demonstrates that § 1981 applies to reverse citizenship discrimination. *McDonald*, 427 U.S. at 296. Congress indicated that the legislation that became § 1981 was intended to broadly protect "all persons" and "all citizens," "regards all men in their civil rights as equal before the law," and was intended to prohibit reverse discrimination. *Id.* at 287, 290, 293, 295. The legislative history shows that § 1981 was not intended to limit its protections to minority groups "'when there is no such distinction in it'" between groups. *Id.* at 290 (quoting legislative history).

Third, public policy weighs in favor of applying § 1981 to reverse citizenship discrimination, as allowing citizenship discrimination claims by aliens but not U.S. citizens would allow displacement of and unfair treatment of American workers, and would be inconsistent with Congress' stated policy goals of protecting all citizens and ensuring the equality of all persons' civil rights.

Fourth, every district court within the Ninth Circuit to address the issue indicated that § 1981 applies to citizenship discrimination against U.S. citizens. *See Hernandez v. Siri & Son Farms, Inc.*, No. 6:20-CV-00669, 2021 WL 4999022, at *7, 8 (D. Or. Sept. 30, 2021), *report &*

14

*recommendation adopted*, 2021 WL 4993475 (D. Or. Oct. 27, 2021); *Gomez v. Thrive Lifestyle Servs., LLC*, No. 3:12-CV-00766, 2014 WL 4631201, at *7 (D. Or. Sept. 15, 2014); *Murillo v. Servicios Agricolas Mex, Inc.*, No. CV-07-2581, 2012 WL 1030084, at *11 (D. Ariz. Mar. 27, 2012); *Jimenez*, 742 F. Supp. 2d at 1085-87.

Fifth, the lower court's reasoning, and the cases relied on by the lower court are unpersuasive. Below, the magistrate judge failed to analyze the statutory text, which is dispositive, and made only cursory references to legislative history or to the Supreme Court's *McDonald* decision. The authorities relied on by the magistrate are all out-of-circuit decisions, several address the issue only in *dicta*, and none conduct a thorough analysis of the issue. And the magistrate's belief that § 1981's application to citizenship discrimination is simply an extension of race is contradicted by Ninth Circuit precedent, which recognizes the independent basis for citizenship discrimination claims in the statutory text.

## STANDARD OF REVIEW

The Court reviews *de novo* the district court's grant of a motion to dismiss, *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008), and

reviews *de novo* the district court's statutory interpretation. *Johnston v. Regal Entm't. Grp.*, 787 F. App'x 413, 413 (9th Cir. 2019) (citing *ASARCO LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1208 (9th Cir. 2015)).

## ARGUMENT

Plaintiff Rajaram filed suit against Meta alleging a violation of 42 U.S.C. § 1981, which provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "The protection of this statute has been held to extend to aliens as well as to citizens." *Graham v. Richardson*, 403 U.S. 365, 377 (1971) (citing *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 n.7 (1948)). Section 1981 applies to claims of reverse citizenship discrimination against U.S. citizens. *See, e.g.*, *Jimenez*, 742 F. Supp. 2d at 1086 ("Section 1981 prohibits [citizenship] discrimination against persons of all citizenships and not only non-Americans.").

The applicability of § 1981 to reverse citizenship discrimination claims of U.S. citizens is demonstrated by: (1) the text of § 1981, which protects "[a]ll persons" against the prohibited types of discrimination, and in no way limits its protections to aliens, *see* 42 U.S.C. § 1981; (2) the

legislative history of § 1981, which indicates that it applies broadly to all persons and protects against reverse discrimination, *see McDonald*, 427 U.S. at 287, 296; (3) public policy and policy goals of Congress, which support ensuring equal treatment of U.S. citizens before the law, and weigh against allowing the displacement of and unfair treatment of American workers; (4) the decisions of every prior district court within the Ninth Circuit to address the issue, which found that § 1981 applies to reverse citizenship discrimination; and (5) that the magistrate judge's opinion below fails to consider the statutory text and relies entirely on poorly reasoned out-of-circuit decisions.

## I.  **The Statutory Language of § 1981 Protects "All Persons," Not Only "Aliens."**

"'The preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there.  Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous.'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (quoting *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008)). "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and

17

consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).

Section 1981 provides that: "*All persons* within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (emphasis added). The Ninth Circuit has found that the reference to rights "enjoyed by white[s]" reflects that the statute prohibits discrimination based on race, while the reference to rights "enjoyed by . . . citizens" reflects that the statute prohibits discrimination based on alienage or citizenship status. *Sagana*, 384 F.3d at 737-38 ("Just as the word 'white' indicates that § 1981 bars discrimination on the basis of race, the word 'citizen' attests that a person cannot face disadvantage in the activities protected by § 1981 solely because of his or her alien status.") (footnote omitted); *see also Chattopadhyay v. BBVA USA*, No. 21-15017, 2021 WL 4958850, at *1 (9th Cir. Oct. 26, 2021) ("Plaintiffs have a legally protected interest in making contracts free of *citizenship discrimination* under Section 1981") (emphasis added).

The statute does not limit the categories of people who may bring suit on the basis of racial or citizenship discrimination, such as non-

18

whites or non-citizens. 42 U.S.C. § 1981. The words "alien" or "non-citizen" appear nowhere in the statute. *Id.* Courts often use "alienage" and "'citizenship" interchangeably. ER-33 (conceding that "most cases use the terms citizenship and alienage interchangeably"); *see also Jimenez*, 742 F. Supp. 2d at 1086 n.1 ("Not only does Section 1981's text not include the term 'alien,' courts recognizing discrimination against non-citizens have used the terms 'alienage' and 'citizenship' interchangeably.").[3] Because there is no distinction between alienage and citizenship in the statute, and the terms are used interchangeably, § 1981 applies to citizenship discrimination, as it is well-established that it applies to alienage discrimination. *Sagana*, 384 F.3d at 738; *see also Chattopadhyay*, 2021 WL 4958850, at *1.

Looking at the structure of the statute, the clause identifying the protected class is "[a]ll persons," thereby broadly defining the protected

---

[3] In *Anderson v. Conboy*, 156 F.3d 167, 169 (2d Cir. 1998), for example, the court described *Rios v. Marshall*, 530 F. Supp. 351 (S.D.N.Y. 1981) as a case involving "alienage discrimination," where plaintiffs in *Rios* were U.S. citizen farmworkers alleging reverse citizenship discrimination in favor of non-U.S. citizens in violation of § 1981. *Rios,* 530 F. Supp. at 355.

class. 42 U.S.C. § 1981(a); *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 831 (9th Cir. 1996) (considering statutory structure in interpreting a federal statute and finding that "[t]he term 'all' makes the mandate applicable to the entire category").

If Congress had intended to protect only non-citizens against citizenship discrimination, it could easily have done so by stating that "aliens" or "non-citizens"—rather than "all persons"—shall be entitled to the same rights as "citizens." *Sagana*, 384 F.3d at 738 ("For protection against alienage discrimination to be excluded from § 1981, the text would have to disclaim the citizenship distinction by comparing 'all persons' to 'white persons,' or 'all citizens' to 'white citizens,' instead of 'all persons' to 'white citizens,' as the statute now reads.").

Moreover, the Supreme Court's prior decision in *McDonald* is controlling because it interpreted identical language in § 1981 to determine whether the statute applies to reverse discrimination. *McDonald*, 427 U.S. at 287; *Duane v. GEICO*, 37 F.3d 1036, 1038 (4th Cir. 1994) (finding prior Supreme Court interpretation of § 1981 controlling in construing statute). In *Duane*, the Fourth Circuit examined whether § 1981 provided a private right of action for *citizenship*

20

discrimination claims brought by aliens where the Supreme Court had already found that § 1981 provided a private right of action for *racial* discrimination claims. *Duane*, 37 F.3d at 1038. The Fourth Circuit held that because the relevant language and structure of the act prohibiting racial discrimination "are nearly identical to the language" in the act prohibiting citizenship discrimination, the Supreme Court's decisions finding that there is a private right of action under § 1981 for racial discrimination "*require* us to find that" the citizenship discrimination provisions of § 1981 reached private discrimination. *Id.* at 1040 (emphasis added).[4]

Similarly, in *McDonald*, the Supreme Court held that § 1981 applies to reverse racial discrimination based on identical statutory language as the language relevant to the issue of reverse citizenship discrimination. 427 U.S. at 286-87, 296; 42 U.S.C. § 1981(a) ("*All persons* . . . have the same right . . . to make and enforce contracts . . . as is enjoyed

---

[4] The *Duane* court compared the language of the Civil Rights Act of 1866 with the language of the Civil Rights Act of 1870. *Id.* at 1141, 1142. The 1870 Act reenacted and expanded the 1866 Act, and was later codified as § 1981. *Id.* at 1038, 1043.

by *white citizens*.") (emphasis added). The *McDonald* Court held that "our examination of the language and history of § 1981 convinces us" that it extends to claims of reverse discrimination "against white persons" where the statute explicitly protects "[a]ll persons," which necessarily includes "white persons." *Id.* at 286-87 (citing *United States v. Wong Kim Ark*, 169 U.S. 649, 675-76 (1898)). Similarly, because the statute protects "[a]ll persons," this necessarily includes citizens bringing claims of reverse citizenship discrimination. 42 U.S.C. § 1981(a); *Jimenez*, 742 F. Supp. 2d at 1085 ("Contrary to Defendants' assertion, the plain text of Section 1981 applies to '[a]ll persons,' which necessarily includes both citizens and non-citizens."); *see also Richardson*, 403 U.S. at 375 (explaining in the context of § 1981 that "an alien as well as a citizen is a 'person' for equal protection purposes"); *Sagana*, 384 F.3d at 738 ("'The protection of this statute has been held to extend to aliens as well as to citizens.'") (quoting *Richardson*, 403 U.S. at 377).

The *McDonald* decision is especially instructive here and "require[s]" a parallel finding because the relevant statutory language and structure related to reverse racial discrimination and reverse citizenship discrimination is "nearly identical." *Duane*, 37 F.3d at 1040;

42 U.S.C. § 1981. In holding that § 1981 applies to reverse citizenship discrimination claims brought by U.S. citizens, the *Jimenez* court reasoned—consistent with *Duane*—that, "[a]s *McDonald* concluded that the plain language of Section 1981 prohibits discrimination against persons of all races, and not only non-whites, it is axiomatic that, Section 1981 prohibits discrimination against persons of all citizenships and not only non-Americans." 742 F. Supp. 2d at 1086.

The *McDonald* Court also examined the phrase "as is enjoyed by white citizens," acknowledging that "a mechanical reading of the phrase . . . would seem to lend support to [a] reading of the statute" as not protecting race discrimination claims brought by whites, and found that the phrase simply "emphasiz[es]" the "'character of the rights being protected.'" 427 U.S. at 287 (quoting *Georgia v. Rachel*, 384 U.S. 780, 791 (1966)). Specifically, "white" emphasizes that § 1981 protects rights based on race, *id.*, while "citizens" emphasizes that § 1981 protects rights based on citizenship. *Sagana*, 384 F.3d at 738.

Because white citizens enjoyed a numerical majority and superior legal protection in 1866, "white citizens" set the standard by which the race and citizenship-based civil rights under § 1981 of *all* persons were

to be measured, not just non-whites or non-citizens. *Ortiz v. Bank of Am.*, 547 F. Supp. 550, 563 (E.D. Cal. 1982) ("'[S]ection 1981 makes no mention of race . . . or alienage. The only reference is that all persons shall have described rights and benefits of white citizens. Thus the standard against whom the measure was to be made were the rights and benefits of white citizens.'") (quoting *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 970 (10th Cir. 1979)).[5]

## II.  Legislative History Demonstrates That Congress Intended § 1981 to Apply to Reverse Citizenship Discrimination.

"[C]ourts 'can only look to legislative intent when a statute is ambiguous.'" *Haro v. City of L.A.*, 745 F.3d 1249, 1257 (9th Cir. 2014) (quoting *Cleveland v. City of L.A.*, 420 F.3d 981, 990 n.11 (9th Cir. 2005)). Because the statutory language and structure is unambiguous, and the language has already been construed in a controlling Supreme Court

---

[5] *See also Hollander v. Sears, Roebuck & Co.*, 392 F. Supp. 90, 94 (D. Conn. 1975) ("Although the rights enjoyed by whites are used as the measuring stick under § 1981, whites themselves may be denied the rights which are normally available to members of their race.  When that occurs, within the scope of activities protected by § 1981, and it is a result of racial discrimination, § 1981 provides them with a cause of action.").

24

opinion, as discussed above, it is unnecessary to consider legislative history. If legislative history were relevant to the analysis, however, it further demonstrates that § 1981 was intended to protect against reverse discrimination and to protect U.S. citizens. *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929) (stating that legislative history may be used to "confirm . . . the meaning conveyed by the words used"); *McDonald*, 427 U.S. at 296 (citing "statutory structure and legislative history" to find § 1981 applicable to reverse discrimination); *Juarez v. Soc. Fin., Inc.*, No. 20-CV-03386-HSG, 2021 WL 1375868, at *6 (N.D. Cal. Apr. 12, 2021) ("[Section] 1981's legislative history underscores that it was intended to apply broadly.").

Section 1981 is derived from the Civil Rights Act of 1866 and the Civil Rights Act of 1870. *Runyon v. McCrary*, 427 U.S. 160, 169 n.8 (1976). Section "16 of the 1870 Act was merely a re-enactment, with minor changes, of certain language in § 1 of the 1866 Act." *Id.* Specifically, the 1866 Act, Section 1, provided in relevant part that "citizens . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Civil Rights Act of 1866, § 1, 14 Stat. 27 (1866). The 1870 Act "reenacted the 1866 Act," and "Section 16 of the

1870 Act expanded many of section 1 [of the 1866 Act]'s discrimination protections to non-citizens" by replacing "citizens" with "all persons." *Duane*, 37 F.3d at 1038.  The 1870 Act provided, in relevant part: "[A]ll persons within the jurisdiction of the United Sates shall have the same right . . . to make and enforce contracts . . .  as is enjoyed by white citizens."  Civil Rights Act of 1870, § 16, 16 Stat. 140 (1870).  "[S]ection 1 of the 1866 Act and section 16 of the 1870 Act were codified without substantive change . . . to form what is now 42 U.S.C. § 1981." *Duane*, 37 F.3d at 1038-39; *see* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens.").

In finding that legislative history further supported its holding that § 1981 applies to reverse discrimination, the *McDonald* Court observed that the 1866 Civil Rights Act "was introduced by [the bill's author] Senator Trumbull of Illinois as a 'bill . . . to protect All persons in the United States in their civil rights.'" 427 U.S. at 287 (quoting Cong. Globe, 39th Cong., 1st Sess., 211 (1866)).  Senator Trumbull further explained, in rebutting a suggestion that the bill did not prohibit reverse discrimination, that the bill "'applies to white men as well as black men.

It declares that *all persons* in the United States shall be entitled to the same civil rights,'" and that the "'object of [the bill] is to secure equal rights to *all the citizens* of the country.'" *Id.* at 290 (emphasis added) (quoting Cong. Globe, 39th Cong., 1st Sess. at 599). Similarly, Representative Wilson, Chairman of the House Judiciary Committee and the bill's floor manager in the House, "urged that the bill should pass 'to *protect our citizens* . . . in the enjoyment of the great fundamental rights which belong to *all men.*'" *Id.* at 293 n.23 (emphasis added) (quoting Cong. Globe, 39th Cong., 1st Sess. at 1118). The *McDonald* Court also quoted a statement from Representative Lawrence that the bill "'regards all men in their civil rights as equal before the law'" and would "'protect every citizen.'" *Id.* at 295 (quoting Cong. Globe, 39th Cong., 1st Sess. at 1833).

The *McDonald* Court considered whether the House's amendment to the Senate's version of the bill to add the phrase "as is enjoyed by white citizens" was intended to exclude claims of reverse discrimination by whites. *Id.* at 290-91. The Court found the legislative history "clear" that the phrase "was not intended to have the effect of eliminating from the bill the prohibition of racial discrimination against whites," and that

deciding otherwise would "contradict th[e] more general language" of the bill. *Id.* at 290-92.

Similarly, prohibiting reverse citizenship discrimination claims brought by citizens would be inconsistent with the "more general language" of the statute, and with the legislative history that the bill intended that "all persons" be treated equally, that reverse discrimination be prohibited, and that "every citizen" be protected. *Id.* at 290, 292, 295.

The legislation was amended in 1870 "under Congress' Fourteenth Amendment powers to prevent the States from denying to 'any person . . . equal protection of the laws.'" *Runyon*, 427 U.S. at 202 (White, J., dissenting) (quoting U.S. Const., Am. 14, § 1); *see also Anderson*, 156 F.3d at 173 ("The 1870 Act was passed pursuant to the Fourteenth Amendment[.]"). "'The Fourteenth Amendment and the laws adopted under its authority . . . embody a general policy that *all persons* lawfully in this country shall abide . . . on an equality of legal privileges with all citizens under nondiscriminatory laws.'" *Richardson*, 403 U.S. at 374 (emphasis added) (quoting *Takahashi*, 334 U.S. at 420).

Nothing in the legislative text or history of the 1870 Act suggests that Congress, in expanding the protections of the 1866 Act to "all persons," intended the more expansive language to provide less than equal protection to citizens or to preclude application to claims of reverse discrimination. In introducing the 1870 bill, the sponsor, Senator Stewart, stated that it was a bill "to secure to *all persons* equal protection of the laws." Cong. Globe, 41st Cong., 2d Sess., 1536 (1870) (emphasis added). He explained that "[t]he original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens, so that *all persons* who are in the United States shall have the *equal protection* of our laws." *Id.* (emphasis added). He further stated that for "Chinese aliens or any other aliens . . . let them be protected by all the laws and *the same laws* that other men are. That is all there is in that provision." *Id.* at 3658 (emphasis added). It is notable that Senator Stewart emphasized that aliens would be protected by the same laws that "other men" (i.e., citizens) are – not that aliens would be afforded new or additional protections. *Id.* Nor is there any reference in the legislative history to "alienage" discrimination as distinct from citizenship discrimination. *Id.*

29

In the floor debate on the 1866 Act, Senator Davis of Kentucky attacked the bill as "monstrous" for being "partial, unjust, and iniquitous" because he understood it to provide greater protections for blacks than for "the white man, the sovereign, the citizen, and lord of this land." Cong. Globe, 39th Cong., 1st Sess. at 599. Senator Trumbull responded that Senator Davis's accusation about the bill not protecting "the white man, . . . the citizen" was "'monstrous,'" "'abominable,'" and an "'epithet[,]'" as the "'only object of [the bill] . . . is to secure equal rights *to all*,'" "'[i]t declares that *all persons* in the United States shall be entitled to the same civil rights,'" and it cannot be interpreted as "'a bill for the benefit of black men exclusively when there is *no such distinction in it*.'" *McDonald*, 427 U.S. at 290 (emphasis added) (quoting Cong. Globe, 39th Cong., 1st Sess. at 599).[6] The *McDonald* Court cited this history in finding that the legislative history was "clear" that the law "was not limited in scope to discrimination against nonwhites." 427 U.S. at 290.

---

[6] While Senator Trumbull was not the sponsor of the 1870 Act (Senate Bill 365), he was involved in its passage. Cong. Globe, 41st Cong., 2nd Sess. at 1536 (reflecting that Senator Trumbull reported the bill, with an amendment, to the full Senate after it was considered by the Judiciary Committee).

Just as the racial discrimination provision does not contain any "distinction in it" between who can invoke its protections, the citizenship discrimination provision also does not contain any "distinction in it" between who can invoke its protections. *See* 42 U.S.C. § 1981(a); *McDonald*, 427 U.S. at 290 (citing Cong. Globe, 39th Cong., 1st Sess. at 599). And Congressional intent not to provide greater protection to aliens than citizens is also demonstrated by the outrage expressed in Congress over the possibility that equal protection would not be given to "the white man" or "the citizen," and the response that the bill "declares that *all persons in the United States* shall be entitled to the same civil rights." Cong. Globe, 39th Cong., 1st Sess. at 599 (emphasis added); *see also McDonald*, 427 U.S. at 290; *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71-72 (1977) (citing *McDonald* for the proposition that "similarly situated employees are not to be treated differently . . . regardless of whether the discrimination is directed against majorities or minorities.").

Meta has pointed to the legislative history of the Civil Rights Act of 1870 indicating that its immediate purpose was to protect Chinese aliens from citizenship discrimination, and arguing that this demonstrates that it only protects aliens and not citizens from citizenship discrimination.

ER-88 (citing *Anderson*, 156 F.3d at 173-74). A parallel argument was

made in *McDonald*, where defendants argued that § 1981 does not protect

whites because the immediate purpose of the law was to protect former

black slaves from discrimination, not to protect whites. 427 U.S. at 285,

289. The Supreme Court acknowledged that the "immediate impetus for

the bill" was to protect former slaves, but rejected the argument that it

did not apply to whites, finding that the statute contained "broad

language" that did not limit its protections "to that limited goal" of

protecting former slaves. *Id.* at 289.[7] The *McDonald* Court explained:

> Unlikely as it might have appeared in 1866 that
> white citizens would encounter substantial racial
> discrimination . . ., the statutory structure and
> legislative history persuade us that the 39th
> Congress was intent upon establishing in the
> federal law a broader principle than would have
> been necessary simply to meet the particular and
> immediate plight of the newly freed Negro slaves.

---

[7] Similarly, in *Wong Kim Ark*, the Supreme Court held that the language "*All persons* born in the United States" in the Fourteenth Amendment is "broad and clear" and could not be construed to exclude Chinese despite the Chinese Exclusion Acts that prohibited naturalization of Chinese immigrants, even though the amendment's "main purpose doubtless was . . . to establish the citizenship of free negroes," not Chinese. 169 U.S. at 676, 704.

427 U.S. at 295-96. Similarly, the fact that the 1870 Act was intended to benefit Chinese aliens does not supersede the broader statutory language stating that it protected "all persons," or the legislative history of the bill indicating that it "secure[s] to *all persons* equal protection of the laws," Cong. Globe, 41st Cong., 2d Sess. at 1536, and that aliens would be "protected by all the laws and *the same laws* that other men are." *Id.* at 3658 (emphasis added); *see also McDonald*, 427 U.S. at 289; Rachel Bloomekatz, *Rethinking Immigration Status Discrimination and Exploitation in the Low-Wage Workplace*, 54 UCLA L. Rev. 1963, 2001 (2007) ("Despite . . . distinctions in the legislative history, it is unreasonable to assume Congress intended [§ 1981] to protect white persons from racial discrimination, but not citizens from alienage discrimination.").

### III. <u>Public Policy Supports Including U.S. Citizens in § 1981's Protections.</u>

Policy arguments and legislative history are relevant in discerning congressional intent if the literal application of a statute would produce a result "'demonstrably at odds with the intention of its drafters.'" *In re De Laurentiis Entm't. Grp., Inc.*, 124 B.R. 305, 308 (C.D. Cal. 1991) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989));

*see also Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 220-21 (1980) ("Since our present task is one of statutory construction, questions of public policy cannot be determinative of the outcome unless specific policy choices fairly can be attributed to Congress itself.").

To the extent that public policy is relevant, it further supports interpreting § 1981 to protect citizens, as such a policy choice can fairly be attributed to Congress. *See Sprint PCS Assets, L.L.C. v. City of La Canada Flintridge*, 448 F.3d 1067, 1071 (9th Cir. 2006) (stating that it is unnecessary to address public policy arguments where statutory language is clear, but that "[i]n any event, public policy also supports this interpretation"); *In re De Laurentiis*, 124 B.R. at 308; *Dawson Chem.*, 448 U.S. at 220-21.

Interpreting § 1981 to allow citizenship discrimination claims by aliens but not U.S. citizens would be inconsistent with the principle of equality before the law, would allow the displacement of and unfair treatment of American workers, and would lead to growing resentment against aliens. *See* Kenneth M. Geisler II, *Fissures in the Valley: Searching for a Remedy for U.S. Tech Workers Indirectly Displaced by H-1B Visa Outsourcing Firms*, 95 Wash. U. L. Rev. 465, 466-67 & n.17, 481-

82, 498-99 (2017) (discussing "unfair displacement of U.S. workers" by H-1B visa workers who have been exploited and underpaid, and advocating for the application of Section 1981 to prevent citizenship discrimination against U.S. citizens in favor of H-1B visa workers); Naomi Schoenbaum, *The Case for Symmetry in Antidiscrimination Law*, 2017 Wis. L. Rev. 69, 71-75 (2017) (explaining the value of prohibiting both discrimination and reverse discrimination alike); Bloomekatz, *Rethinking Immigration Status Discrimination and Exploitation*, 54 UCLA L. Rev. at 1968 ("employer preferences for immigrant workers and the corresponding depression in wages underlies discrimination against U.S. workers and immigrant labor abuses").

This is a significant problem, as the fact "[t]hat employers prefer vulnerable immigrant workers seems to be almost popular knowledge." Bloomekatz, *Rethinking Immigration Status Discrimination and Exploitation*, 54 UCLA L. Rev. at 1968, 1999 (advocating for application of § 1981 "as a tool for fighting employer preferences for legally vulnerable immigrant workers" and stating that "an analogy to race discrimination cases [*i.e., McDonald*] suggests that [§ 1981] . . . should prohibit discrimination against U.S. workers based on citizenship").

Here, Congress expressed a policy preference to broadly eliminate discrimination in employment, and to protect all citizens and all persons – not to offer greater protections to aliens than to citizens. 42 U.S.C. § 1981(a) (protecting "[a]ll persons"); *Richardson*, 403 U.S. at 374 ("'laws adopted under [the Fourteenth Amendment's] authority . . . embody a general policy that all persons lawfully in this country shall abide . . . on an equality of legal privileges with all citizens under nondiscriminatory laws'") (quoting *Takahashi*, 334 U.S. at 420); *McDonald*, 427 U.S. at 290 (emphasis added) (quoting statement of Senator Trumbull that the "'only object of [the bill] . . . is to secure equal rights *to all*'") (quoting Cong. Globe, 39th Cong. 1st Sess. at 599).  Congress clearly did not intend to protect aliens at the expense of citizens, or to allow aliens to displace Americans in the workforce. Cong. Globe, 39th Cong., 1st Sess. at 599 (expressing that a law would be "monstrous" if it were "partial" and provided greater protections for minorities than for "the white man, . . . the citizen") (statement of Sen. Davis); *see also Takahashi*, 334 U.S. at

429 & n.6 ("Citizens have rights superior to those of aliens [in some areas of law].") (Reed, J., dissenting).[8]

This is consistent with other civil right statutes addressing employment discrimination, which generally apply to claims of reverse discrimination. *See, e.g.*, *McDonald*, 427 U.S at 279, 287, 296 (holding that both Title VII and § 1981 apply to reverse discrimination based on race); 8 U.S.C. § 1324b(a)(1)(B), (a)(3)(A) (explicitly protecting U.S. citizens from reverse citizenship discrimination); 29 U.S.C. § 206(d) (Equal Pay Act, which protects both men and women).

## IV. All Prior Decisions Within This Circuit Found That § 1981 Applies to Reverse Citizenship Discrimination.

Before the lower court's ruling, every court in this Circuit to address the issue indicated that § 1981 protects U.S. citizens from citizenship discrimination. *See Hernandez*, 2021 WL 4999022, at *7, 8 (denying summary judgment on U.S. citizen's Section 1981 citizenship

---

[8] Congress' intent that aliens not be favored over citizens is further reflected in Congress' passage of the Chinese Exclusion Act in 1882, a short time after the legislation that became § 1981 was passed in 1866 and 1870. *See* Chinese Exclusion Act of 1882, Pub. L. 47-126 (1882) (prohibiting immigration of Chinese laborers).

discrimination claim and finding that citizenship discrimination against U.S. citizens is distinct from national origin discrimination); *Gomez*, 2014 WL 4631201, at *7 ("[Plaintiff] belongs to a protected class of United States citizens" in alleging citizenship discrimination under § 1981); *Murillo*, 2012 WL 1030084, at *11 ("To prevail on their § 1981 claim, . . . Plaintiffs . . . must demonstrate . . . that the Defendants intentionally discriminated against them because they are United States citizens."); *Jimenez*, 742 F. Supp. 2d at 1085-87 ("United States Citizens May Bring a Section 1981 Claim for Discrimination on the Basis of Citizenship.") (citing *Thomas v. Rohner-Gehrig & Co.*, 582 F. Supp. 669 (N.D. Ill. 1984); *United States v. Richard Dattner Architects*, 972 F. Supp. 738, 747-48 (S.D.N.Y. 1997)); *see also Chattopadhyay*, 2021 WL 4958850, at *1 ("Plaintiffs have a legally protected interest in making contracts free of citizenship discrimination under Section 1981"); *Jones v. First Nat'l Bank of Ariz.*, No. CV-09-2384, 2010 WL 2491617, at *2 (D. Ariz. June 17, 2010) ("Section 1981 protects against only certain types of discrimination, such as classifications based on a person's race or citizenship.").

In *Jimenez*, for example, U.S. citizen plaintiffs alleged citizenship discrimination in hiring in favor of non-citizen workers on H-2A visas.

742 F. Supp. 2d at 1082-84.  Defendants argued that § 1981 only applies to alienage discrimination, and that "by definition, Plaintiffs are not aliens."  *Id.* at 1085.  The Arizona District Court relied on the "plain text of Section 1981" to find that the statute protects "'[a]ll persons,' which necessarily includes both citizens and non-citizens." *Id.* (quoting 41 U.S.C. § 1981(a)). The court also cited the *McDonald* decision that "all persons" includes "all races," and found that it necessarily followed that "all persons" includes "all citizenships." *Id.* at 1086 (citing *McDonald*, 427 U.S. at 285).  The court found unpersuasive contrary decisions that based their analysis on limiting § 1981 to claims of "alienage" discrimination against aliens, where the term "alienage" appears nowhere in the statute. *Id.*  The *Jimenez* court also relied on Supreme Court and Ninth Circuit decisions finding that § 1981 applies to U.S. citizens. *Id.* at 1085 (citing *Richardson*, 403 U.S. at 375; *Takahashi*, 334 U.S. at 419; *Sagana*, 384 F.3d at 738).

The *Jimenez* court concluded:

> Section 1981's plain text, as well as Supreme Court and Ninth Circuit precedent hold that Section 1981 (1) protects "all persons" against discrimination, (2) applies to U.S. citizens, and (3) protects against so-called "reverse discrimination." Therefore, it does not follow that

> Americans would be unprotected from this type of discrimination, where non-citizens would be afforded this relief.

*Id.* at 1087 (citing *McDonald*, 427 U.S. at 285; *Takahashi*, 334 U.S. at 419; *Sagana*, 348 F.3d at 738).

Below, Meta and the lower court were unable to cite any in-circuit authority indicating that § 1981 does not extend to reverse citizenship discrimination claims, and Plaintiff is unaware of the existence of any such prior authority. Meta's reliance on out-of-circuit case law is unpersuasive in light of the in-circuit decisions to the contrary. *Cf. Hamdi v. U.S Citizenship & Immigr. Servs.*, No. EDCV 10-894, 2012 WL 632397, at \*10 (C.D. Cal. Feb. 25, 2012) ("The out-of-Circuit authorities Defendants cite are unpersuasive, particularly in light of the clear wording of the regulation and the Ninth Circuit authority cited[.]").

## V.    <u>The Reasoning of the Lower Court and Cases Relied on by the Lower Court Are Not Persuasive.</u>

The reasoning of the magistrate judge below and the cases relied on by the magistrate are not persuasive. In granting Meta's motion to dismiss, Magistrate Judge Beeler did not conduct any meaningful analysis of the text or structure of § 1981, or explain how the statutory language could be read as only applying to aliens and not citizens where

the word "alien" appears nowhere in the relevant statutory language. The court did not explain how "all persons" could be interpreted to exclude "citizens" asserting claims of citizenship discrimination.[9]

Nor did the magistrate discuss or distinguish the legislative history demonstrating that Congress intended § 1981 to broadly protect "all persons," and "all citizens," and that Congress intended for § 1981 to extend to claims of reverse discrimination brought by "the white man . . . the citizen." Cong. Globe, 39th Cong., 1st Sess. at 599 (statement of Sen. Davis). The magistrate made only cursory references to the *McDonald* decision and to legislative history, and did not explain why the principles enunciated in *McDonald* did not apply here. *But see Duane*, 37 F.3d at 1040 (finding prior Supreme Court holdings interpreting nearly identical language of § 1981 in context of race was controlling in the context of citizenship).

---

[9] Because the statutory language is clear – e.g., that it protects "all persons" – that is the only relevant analysis. *See Satterfield*, 569 F.3d at 951 ("our inquiry begins with the statutory text, and ends there as well if the text is unambiguous").

Instead, the magistrate asserted that the out-of-circuit cases suggesting that § 1981 does not apply to claims of reverse citizenship discrimination "illustrate that § 1981 protects primarily against racial discrimination and that 'race' is interpreted broadly and extends to alien status (that is, non-U.S. citizen status)." ER-14. But the magistrate's novel interpretation of the alienage discrimination protections of § 1981 as being an extension of racial discrimination is not found in any of the cited cases and is contradicted by the Ninth Circuit's holding that § 1981's application to alienage or citizenship discrimination derives independently from the word "citizen" in the statutory text. *Sagana*, 384 F.3d at 738 ("[T]he word 'citizen' [in § 1981] attests that a person cannot face disadvantage in the activities protected by § 1981 solely because of his or her alien status.").

Even if the magistrate's novel interpretation were correct that alien or citizenship discrimination were simply an extension of "race" discrimination, the Supreme Court's *McDonald* decision would be binding because the *McDonald* court held that reverse racial discrimination is actionable under § 1981. 427 U.S. at 286-87, 296.

42

Moreover, to the extent that "alienage" can constitute a form of racial discrimination, discrimination against U.S. citizens is equally susceptible to being a form of racial discrimination as discrimination against aliens. Persons of different racial backgrounds can be aliens, including Caucasians who are citizens of European countries, or blacks who are citizens of African countries, just as Caucasians, African-Americans, and others can be U.S. citizens.

The magistrate also stated that she was granting the motion to dismiss because she understood that "the weight of authority supports the conclusion that U.S. citizens are not a protected class under § 1981." ER-10. But the reasoning of the cited cases is unpersuasive, and several of the cited cases addressed the issue only in *dicta*.

Most significantly, the magistrate relied on *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731 (5th Cir. 1986). There, plaintiff was a natural-born U.S. citizen who originally brought a claim for national origin discrimination under Title VII, and later added a § 1981 claim, apparently without specifically alleging citizenship discrimination. *Id.* at 732. The trial court dismissed both claims at trial on a Rule 41(b) motion at the close of plaintiff's case. *Id.* The Fifth Circuit reversed dismissal of

43

the Title VII claim, observing that Title VII prohibits reverse national origin discrimination claims brought by Americans, as such discrimination "'contradicts the purpose and intent of Title VII,'" and finding that plaintiff had met his initial burden where, *inter alia*, testimony was offered by a former VP of defendant that the company "based its dismissals on the nationalities of its employees."[10] *Chaiffetz*, 798 F.2d at 733 (quoting *Rohner-Gehrig*, 582 F. Supp. at 675).[11]

With respect to § 1981, the Fifth Circuit failed to analyze the text or legislative history of § 1981, did not consider whether discrimination against U.S. citizens contradicts the "purpose and intent" of § 1981, and

---

[10] In the Title VII context, courts have used "nationality" and "national origin" interchangeably. *Deravin v. Kerik*, 335 F.3d 195, 202 (2d Cir. 2003); *Molerio v. FBI*, 749 F.2d 815, 823 (D.C. Cir. 1984). Similarly, one of the definitions of "nationality" in Merriam-Webster's Dictionary is "a people having a *common origin*, tradition, and language and capable of forming or actually constituting a nation-state." Nationality, Merriam-Webster (last accessed Feb. 3, 2023), *available at* https://www.merriam-webster.com/dictionary/nationality (emphasis added).

[11] Plaintiff Chaiffetz's primary claim and the evidence he presented at trial related to discrimination based on national origin, not citizenship, and plaintiff had apparently failed to support a citizenship discrimination claim rather than a national origin claim under the specific facts of the case. *Id.* at 732-33.

44

devoted a single paragraph to analyzing whether the lower court erred in dismissing the § 1981 claim. *Id.* at 735. The court observed that § 1981 "applies to aliens," but not to national origin discrimination, and stated that in attempting to avoid dismissal as a national origin claim, plaintiff sought to "characteriz[e] his [§ 1981] case as one involving 'reverse discrimination on the basis of *alienage*.'" *Id.* (emphasis added). In affirming dismissal, the *Chaiffetz* court reasoned – without citing any authority – that "[d]iscrimination against whites is racial discrimination, but (in America) discrimination against Americans can never be discrimination based on *alienage*. It can only be discrimination based on national origin, and we reaffirm [that] . . . relief under § 1981 is unavailable [for national origin discrimination]." *Id.*[12]

---

[12] Courts have recognized that citizenship discrimination claims are distinct from national origin discrimination claims. *Hernandez*, 2021 WL 4999022, at *7 (rejecting defendant's argument that U.S. citizen plaintiffs' citizenship discrimination claim should be treated as a national origin claim); *Novak v. World Bank*, No. 79-0641, 1979 WL 225, at *1 (D.D.C. June 13, 1979) (dismissing Title VII claim because plaintiff only alleged discrimination based on citizenship, not national origin). Here, Plaintiff Rajaram is a U.S. citizen of Indian national origin, and alleges discrimination against U.S. citizens in favor of foreign visa workers, many of whom are Indian citizens. He can only assert a

The court's reasoning went no deeper than to *assume* that § 1981 citizenship discrimination claims only applied to aliens, and to find that because U.S. citizens, by definition, were not aliens, § 1981 did not apply. *Chaiffetz*, 798 F.2d at 735; *Jimenez*, 742 F. Supp. 2d at 1086 ("Both *Chaiffetz* and *Vaughn* [*v. City of N.Y.*, No. 06-cv-6547, 2010 WL 2076926, at *10 (E.D.N.Y. May 24, 2010)] reasoned that the term 'alienage,' according to its dictionary definition, could apply only to non-U.S. citizens."). But § 1981 does not include the term "alien," but instead applies to "[a]ll persons." 42 U.S.C. § 1981(a); *Jimenez*, 742 F. Supp. 2d at 1086 (rejecting *Chaiffetz*). And courts addressing citizenship discrimination under § 1981 "have used the terms 'alienage' and 'citizenship' interchangeably." *Jimenez*, 742 F. Supp. 2d at 1086 n.1; ER-33. Thus, there is no statutory basis for assuming that § 1981 applies only to alienage and not citizenship discrimination. *Jimenez*, 742 F. Supp. 2d at 1086 ("The cases cited by Defendants [including *Chaiffetz*

---

citizenship discrimination claim, not a national origin discrimination claim.

and *Vaughn*] are unpersuasive, because like Defendants they base their analysis on the word 'alienage' which is nowhere in the statute.").

Moreover, unlike the Fifth Circuit, the Ninth Circuit has recognized that § 1981 applies to claims of "citizenship discrimination," not just "alienage" discrimination. *Compare Chaiffetz*, 798 F.2d at 735 ("§ 1981 applies to aliens" and "discrimination based on *alienage*"), *with Chattopadhyay*, 2021 WL 4958850, at \*1 ("Plaintiffs have a legally protected interest in making contracts free of *citizenship discrimination* under Section 1981") (emphasis added). Thus, *Chaiffetz*'s holding that "discrimination against Americans can never be discrimination based on *alienage*," 798 F.2d at 735, is irrelevant, as Rajaram alleges discrimination based on *citizenship*. *Chattopadhyay*, 2021 WL 4958850, at \*1; *accord Jimenez*, 742 F. Supp. 2d at 1086; *Hernandez*, 2021 WL 4999022, at \*7.

The other cases cited by the magistrate are similarly unpersuasive. The magistrate cited both *Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39, 49-50 (S.D.N.Y. 2020) and *Maack v. Wyckoff Heights Medical Center*, No. 15 Civ. 3951, 2016 WL 3509338, at \*15 (S.D.N.Y. June 21, 2016) for the proposition that no Second Circuit authority has

established that § 1981's prohibition on citizenship discrimination extends to naturalized U.S. citizens. ER-12 (citing *Meyenhofer* for finding that "no authority in the Second Circuit supported extending § 1981[] . . . to natural-born U.S. citizens"[13] and *Maack* for finding that "no Second Circuit precedent established that § 1981's 'prohibition of alienage discrimination extends to naturalized U.S. citizens'" (quoting *Maack*, 2016 WL 3509338, at *15)).  Here, of course, the relevant issue is whether *Ninth Circuit* precedent establishes that § 1981 extends to U.S. citizens, not Second Circuit precedent, and every prior decision within the Ninth Circuit to address the issue found that it does.

Moreover, the *Maack* court did not decide whether discrimination against U.S. citizens in favor aliens was actionable under § 1981, as plaintiff Maack was a naturalized U.S. citizen alleging discrimination in favor of natural born citizens. *Maack*, 2016 WL 3509338, at *1.  In other words, Maack alleged discrimination based on *naturalization* status, not based on *citizenship* status. *Id.*  The holding in *Maack* was also *dicta* because the plaintiff "ha[d] not properly alleged [a citizenship or

---

[13] *Meyenhofer* cited *Maack* for this proposition.  503 F. Supp. 3d at 49.

alienage] claim" where the complaint lacked factual support for the claim, and plaintiff argued in her brief that "her Section 1981 claim against Defendant is actually one for *racial* discrimination" rather than citizenship discrimination. *Id.* at *14-15.

In *Meyenhofer*, the court observed that the *Jimenez* court found that § 1981 applies to reverse citizenship discrimination against Americans, but was "not persuaded by this out of Circuit decision, which is in tension with the authority in the Second Circuit." 503 F. Supp. 3d at 50. Here, the same logic mandates the opposite conclusion, as the authorities relied on by the magistrate are the out-of-circuit decisions, and those authorities are in tension with the authority within this circuit. *See, e.g.*, ER-12 (relying on out-of-circuit cases); *Jimenez*, 742 F. Supp. 2d at 1085-87 (holding that § 1981 applies to reverse citizenship discrimination); *Hernandez*, 2021 WL 4999022, at *7 (same).

The magistrate cited *Vaughn v. City of New York* for the proposition that "section 1981 prevents 'discrimination on the basis of alienage, i.e. non-U.S. citizenship.'" ER-12 (quoting *Vaughn*, 2010 WL 2076926, at *10). But this decision is not on point, as the fact that § 1981 applies to alienage discrimination does not resolve the issue of whether or not it

49

also applies to discrimination against U.S. citizens (which it does). In *Vaughn*, the plaintiffs "implicitly concede[d] in their brief" that "only the two non-citizen plaintiffs . . . can bring a claim under § 1981," such that the court had no occasion to analyze or decide the issue for U.S. citizens. 2010 WL 2076926, at *10.

The magistrate also cited *dicta* in *Tomason v. Stanley*, No. 6:13-cv-42, 2013 WL 5652040, at *3-4 (S.D. Ga. Oct. 16, 2013). ER-12. There, the court found that plaintiff's § 1981 claim "plead only national origin discrimination," and because the claims "cut only at national origin discrimination, the Court [granted] Defendants' motion to dismiss [the § 1981 claim]." *Tomason*, 2013 WL 5652040, at *3. In addition, the court found that plaintiffs "ple[d] no facts to support their conclusion that race or alienage undergirded Defendants' discrimination," and that plaintiffs' conclusory allegations without factual support "cannot [be] consider[ed] in deciding a motion to dismiss." *Id.* Having already held that it was dismissing the claim, the *Tomason* court stated in *dicta*, relying on *Chaiffetz*, that citizens could not bring claims of discrimination based on *alienage* "because American citizens have no status as aliens upon which the discrimination can be based," but that such claims can only be based

50

on national origin. *Id.* at \*4 (citing *Chaiffetz*, 798 F.2d at 735). But as discussed above, *Chaiffetz*'s reliance on the dictionary definition of "alien" is flawed given that the term "alien" appears nowhere in the statute. *See* 42 U.S.C. § 1981.

Finally, the magistrate made the cursory assertion that "[t]he legislative history of the statute also supports [the court's] conclusion," citing *Anderson* for the proposition that the legislative history included a discussion of "senators' concerns with protecting 'aliens' who were working legally in the country." ER-14 (citing *Anderson*, 156 F.3d at 173-74). Specifically, *Anderson* discussed the immediate goal of protecting legal Chinese aliens. 156 F.3d at 173-74. But as discussed above, "the scope of the bill did not circumscribe its broad language to that limited goal" of protecting the narrow category of persons that was the "immediate impetus for the bill." *McDonald*, 427 U.S. at 289; *see also* Cong. Globe, 41st Cong., 2d Sess. at 1536, 3658 (stating that the bill was intended "to secure to all persons equal protection of the laws" and that under the legislation, aliens would be "protected by all the laws and the same laws that other men are") (statement of Sen. Stewart).

## CONCLUSION

Because the broad text and legislative history of § 1981, along with the Supreme Court's interpretation of § 1981 in *McDonald*, reflect that it applies to "all persons," including citizens, the dismissal order of the magistrate judge should be reversed, the judgment vacated, and the case remanded for further proceedings.

Date: February 6, 2023

KOTCHEN & LOW LLP

*/s/Daniel Low*
Daniel Low
Daniel Kotchen

*Attorney for Appellant Rajaram*

## STATEMENT OF RELATED CASES

There are no related cases known to Appellant at this time.

Date: February 6, 2023

KOTCHEN & LOW LLP

*/s/Daniel Low*
Daniel Low
Daniel Kotchen

*Attorneys for Appellant Rajaram*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | No. 22-16870

I am the attorney or self-represented party.

**This brief contains** | 10,294 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | |.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/Daniel Low | **Date** | 2/6/23

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**  *Rev. 12/01/22*