No. 22-16870

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

PURUSHOTHAMAN RAJARAM,

*Plaintiff-Appellant*,

v.

META PLATFORMS, INC.,

*Defendant-Appellee.*

_____

On Appeal From the United States District Court
for the Northern District of California
Case No. 3:22-cv-02920-LB | The Honorable Laurel Beeler

_____

## META PLATFORMS, INC.'S ANSWERING BRIEF

_____

Michele L. Maryott
Daniel R. Adler
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612
(949) 451-3800

Kelley Pettus
GIBSON, DUNN & CRUTCHER LLP
1801 California Street
Denver, CO 90202
(303) 298-5700

Lauren R. Goldman
Gabrielle Levin
Emily Black
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
lgoldman@gibsondunn.com

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, Meta Platforms, Inc. discloses that it is a publicly traded company (NASDAQ: META) and that no parent corporation or publicly owned corporation owns 10% or more of its stock.

Dated: April 21, 2023                    Respectfully submitted,


_____*s/ Lauren R. Goldman*_____
                                         Lauren R. Goldman

*Counsel for Meta Platforms, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................ 1

STATEMENT OF THE ISSUE ............................................................ 5

STATEMENT OF THE CASE ............................................................. 6

I.   Mr. Rajaram unsuccessfully applies to work at Facebook. ............. 6

II.  Mr. Rajaram sues Meta for allegedly discriminating against
     him and other U.S. citizens. ............................................................ 7

III. The district court grants Meta's motion to dismiss. ....................... 7

SUMMARY OF ARGUMENT .............................................................. 9

STANDARD OF REVIEW .................................................................. 14

ARGUMENT ........................................................................................ 14

I.   Section 1981's text and history make clear that it prohibits
     only discrimination based on race or alien status. ......................... 14

     A.   Neither the statutory text nor the legislative history
          says anything about prohibiting discrimination on the
          basis of U.S. citizenship. ......................................................... 15

     B.   Mr. Rajaram's defense of his expansive reading of
          Section 1981 has no basis in the statute's text or
          history. ..................................................................................... 21

II.  Courts have consistently held that Section 1981 prohibits
     only discrimination based on race or alien status. ......................... 24

     A.   Courts have interpreted Section 1981 and its
          predecessor statutes narrowly for over 150 years. ................. 25

B.    Mr. Rajaram has given the Court no reason to depart from the judicial consensus that Section 1981 should be interpreted narrowly. ............................................................ 27

    1.    Mr. Rajaram's theory of the case depends on a "reverse discrimination" principle never embraced by Congress or the courts. ........................... 28

    2.    There is almost no authority supporting Mr. Rajaram's theory of the case. ................................. 33

III.    Congress specifies the classes it means to protect in anti-discrimination statutes, and it has chosen to protect U.S. citizens only in other legislation, not Section 1981. ...................... 36

A.    Congress consistently specifies which classes it means to protect in civil-rights statutes. .......................................... 37

B.    Congress expressly made U.S. citizens a protected class under another statute in large part because they aren't a protected class under Section 1981. ................................... 39

IV.    Congress has had ample opportunity to expand the reach of Section 1981, but has declined to do so. ......................................... 43

CONCLUSION ....................................................................... 46

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Conboy*,
156 F.3d 167 (2d Cir. 1998) .................................................................. 25

*Aramburu v. Boeing Co.*,
112 F.3d 1398 (10th Cir. 1997)............................................................. 26

*Biran v. JP Morgan Chase & Co.*,
2002 WL 31040345 (S.D.N.Y. Sept. 12, 2002) .................................... 41

*CBOCS W., Inc. v. Humphries*,
553 U.S. 442 (2008)................................................................................ 39

*Chaiffetz v. Robertson Rsch. Holding, Ltd.*,
798 F.2d 731 (5th Cir. 1986)................................................ 8, 11, 12, 29

*Chattopadhyay v. BBVA USA*,
2021 WL 4958850 (9th Cir. Oct. 26, 2021)......................................... 33

*Duane v. GEICO*,
37 F.3d 1036 (4th Cir. 1994)................................................................. 33

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019)............................................................... 14

*Espinoza v. Farah Mfg. Co.*,
414 U.S. 86 (1973)............................................................................ 22, 39

*Gen. Bldg. Contractors Ass'n v. Pennsylvania*,
458 U.S. 375 (1982)........................................................................... 16, 25

*Gen. Dynamics Corp. v. United States*,
49 F.3d 1384 (9th Cir. 1995)....................................................... 4, 40, 41

*Georgia v. Rachel*,
384 U.S. 780 (1966)................................................................................ 25

*Gomez v. Thrive Lifestyle Servs., LLC*,
2014 WL 4631201 (D. Or. Sept. 15, 2014).....................................35, 36

*Graham v. Richardson*,
403 U.S. 365 (1971).............................................................................25

*Hernandez v. Siri & Son Farms, Inc.*,
2021 WL 4999022 (D. Or. Sept. 30, 2021).........................................35

*Jatoi v. Hurst-Euless-Bedford Hospital Authority*,
807 F.2d 1214 (5th Cir. 1987)..............................................................30

*Jimenez v. Servicios Agricolas Mex, Inc.*,
742 F. Supp. 2d 1078 (D. Ariz. 2010) ...........................................34, 35

*Johnson v. Riverside Healthcare Sys., LP*,
534 F.3d 1116 (9th Cir. 2008)...............................................................26

*Jones v. Alfred H. Mayer Co.*,
392 U.S. 409 (1968).........................................................................25, 39

*Jones v. Bechtel*,
788 F.2d 571 (9th Cir. 1986)................................................................26

*Jones v. First Nat'l Bank of Ariz.*,
2010 WL 2491617 (D. Ariz. June 17, 2010) .......................................35

*Jones v. R.R. Donnelley & Sons Co.*,
541 U.S. 369 (2004).............................................................................44

*Keating v. Carey*,
706 F.2d 377 (2d Cir. 1983) ................................................................27

*Maack v. Wyckoff Heights Med. Ctr.*,
2016 WL 3509338 (S.D.N.Y. June 21, 2016).......................................31

*Magana v. Northern Mariana Islands*,
107 F.3d 1436 (9th Cir. 1997)..............................................................34

*McDonald v. Santa Fe Trail Transportation Co.*,
427 U.S. 273 (1976).................................................12, 25, 27, 29, 35

iv

*Meyenhofer v. Larsen & Toubro Infotech Ltd.*,
  503 F. Supp. 3d 39 (S.D.N.Y. 2020)......................................................31

*Monessen Sw. Ry. Co. v. Morgan*,
  486 U.S. 330 (1988) .............................................................................45

*Murillo v. Servicios Agricolas Mex Inc.*,
  2012 WL 1030084 (D. Ariz. Mar. 27, 2012) ........................................36

*Noyes v. Kelly Servs.*,
  488 F.3d 1163 (9th Cir. 2007)..............................................................26

*Patterson v. McLean Credit Union*,
  491 U.S. 164 (1989) .............................................................................44

*Runyon v. McCrary*,
  427 U.S. 160 (1976) .................................................................20, 25, 44

*Sagana v. Tenorio*,
  384 F.3d 731 (9th Cir. 2004)...........................................1, 2, 21, 25, 26

*Saint Francis Coll. v. Al–Khazraji*,
  481 U.S. 604 (1987) ...........................................................11, 26, 27, 31

*Tomason v. Stanley*,
  2013 WL 5652040 (S.D. Ga. Oct. 16, 2013)..........................................31

*Vaughn v. City of New York*,
  2010 WL 2076926 (E.D.N.Y. May 24, 2010) .........................................31

*Zar v. South Dakota Bd. of Exam'rs of Psychs.*,
  976 F.2d 459 (8th Cir. 1992)................................................................26

## Statutes

8 U.S.C. § 1324b...................................................................13, 37, 40, 42

15 U.S.C. § 1691..................................................................................38

29 U.S.C. § 206....................................................................................38

42 U.S.C. § 1981.................................................................1, 5, 7, 9, 15

42 U.S.C. § 2000d ...................................................................... 37

42 U.S.C. § 2000e ...................................................................... 39

42 U.S.C. § 2000ff ..................................................................... 38

42 U.S.C. § 3604 ........................................................................ 37

Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27, 27 ..................................... 16

Act of May 31, 1870, ch. 114, § 17, 16 Stat. 140, 144 ........................ 10, 18

Cal. Gov. Code § 12940 .............................................................. 38

## Other Authorities

131 Cong. Rec. S11434–35 (1985) ............................................. 41

137 Cong. Rec. H1665 (1991) ...................................................... 44

137 Cong. Rec. S3021 (1991) ...................................................... 44

*Anti-Discrimination Provision of H.R. 3080: J. Hearing
    Before the H. Comm. on the Judiciary and the Subcomm.
    on Immigration & Refugee Policy of the S. Comm. on the
    Judiciary*, 99th Cong. 61 (1985) ............................................. 40, 41, 42

Charles J. McClain, Jr., *The Chinese Struggle for Civil
    Rights in Nineteenth Century America: The First Phase,
    1850-1870*, 72 Cal. L. Rev. 529 (1984) .................................... 19

Cong. Globe, 39th Cong., 1st Sess. (1866) ............................. 17, 18, 22, 24

Cong. Globe, 41st Cong., 2d Sess. (1870) ................................. 19

H.R. Rep. No. 99-682, pt. 2 (1986) ............................................. 40

H.R. Rep. No. 682, pt. 1 (1986) .................................................. 41

vi

## INTRODUCTION

Mr. Rajaram, who was born in India but later became a U.S. citizen, claims Meta declined to hire him because of his citizenship, and that this decision violated Section 1981. There are many reasons why that theory is contrary to the facts and the law, but this appeal concerns only one: As the district court correctly concluded, Section 1981 bars racial discrimination and discrimination against aliens, but does *not* protect U.S. citizens against discrimination on the basis of their citizenship. That is the only reading of Section 1981 that is consistent with its text, its extensive legislative history, a long line of decisions refusing to extend the statute to cover other types of discrimination, Congress's consistent practice of specifying the classes protected by anti-discrimination statutes, and Congress's decision not to amend the statute to expand its scope.

*Statutory text.* The text of Section 1981 makes clear that, as the district court held, U.S. citizens are not a protected class. The statute guarantees to "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. The word "white" reflects an intent to prohibit *racial* discrimination. *Sagana v.*

*Tenorio*, 384 F.3d 731, 738 (9th Cir. 2004). And the "guarantee that 'all persons' may enjoy the same rights that 'white citizens' enjoy" shows that the statute bars discrimination based on "alien status." *Id.* But nothing in the statute supports Mr. Rajaram's view that he can sue for discrimination merely because he possesses U.S. citizenship.

*Statutory history.* The history of Section 1981, whose language is more than 150 years old, confirms that it does not protect against that sort of discrimination. Section 1981 is a recodification of two Reconstruction-era federal statutes, Section 1 of the Civil Rights Act of 1866 and Section 16 of the Voting Rights Act of 1870, which together prohibited discrimination based on race and alien status. These statutes were enacted in response to two waves of discriminatory state laws: one targeting newly freed slaves in the South on the basis of their race, and the other targeting Chinese laborers in the West on the basis of their race or alien status. In the floor debates about 1866 Act, no one spoke of anything but racial discrimination. And, as the district court correctly observed, in the debates about the 1870 Act, no one spoke of anything but expanding the class of people protected by the first law to include aliens.

That was accomplished by permitting "all persons," not just "citizens," to sue for discrimination.

Mr. Rajaram pins his case on the phrase "all persons," arguing that it includes U.S. citizens. But the question is not *who* can sue; the statute makes clear it's anyone in the United States, citizen and noncitizen alike. The question is what they can sue *for*—i.e., what types of alleged discrimination can form the basis of a Section 1981 claim. Mr. Rajaram's answer to that question—that U.S. citizens can bring a claim that they were discriminated against for *not* being aliens—finds no support in Section 1981's history. Mr. Rajaram identifies nothing in the legislative record to support his theory that Congress intended to target discrimination on the basis of U.S. citizenship.

*Precedent.* Mr. Rajaram's theory is also inconsistent with a large body of cases interpreting Section 1981 narrowly. Dozens of cases hold that the statute prohibits only discrimination based on race or alien status. Plaintiffs have argued for decades that Section 1981 protects against other types of discrimination—for example, discrimination based on national origin, sex, sexual orientation, religion, age, disability, and political affiliation—but courts have repeatedly declined to expand

3

Section 1981 beyond its narrow historical purposes. As the district court noted, only one court of appeals (the Fifth Circuit) has addressed the question whether discrimination based on U.S. citizenship is an exception to this general rule, and it held the answer is no. Mr. Rajaram would have this Court open a circuit split for no good reason.

*Related statutes.* Mr. Rajaram's theory is also impossible to reconcile with the text and judicial construction of other anti-discrimination statutes. Congress consistently spells out the types of discrimination it is targeting, and courts steadfastly refuse to rewrite these statutes by expanding the list. When Congress identifies gaps in anti-discrimination statutes, it sometimes passes new laws. That's exactly what it did for discrimination on the basis of U.S. citizenship. Expressly recognizing that no existing law, including Title VII and Section 1981, prohibited discrimination on the basis of U.S. citizenship, Congress forbade it in the Immigration Reform and Control Act of 1986, or the IRCA. This Court has said that the IRCA thus contains "a proscription not encompassed by other antidiscrimination statutes." *Gen. Dynamics Corp. v. United States*, 49 F.3d 1384, 1385 (9th Cir. 1995). But the IRCA doesn't create a private right of action; it instead

authorizes only administrative proceedings before the Department of Justice. Mr. Rajaram therefore has a remedy—just not under Section 1981.

*Congressional ratification.* Congress has also conspicuously declined to amend Section 1981 to reach discrimination on the basis of anything other than race and alien status, even though courts have for decades interpreted the statute narrowly. Congress has amended the statute, most recently in 1991, but never to expand the categories of discrimination it prohibits. Congress's decision not to amend the statute in that way confirms its narrow reach.

In short, Mr. Rajaram has not discovered a new way to sue under Section 1981. This lawsuit is just another failed attempt to expand the statute beyond its narrow historical reach. For that reason, this Court should affirm the judgment.

## STATEMENT OF THE ISSUE

Section 1981 provides, in relevant part: "All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. Section 1981 is a codification of two statutes, Section 1 of the Civil Rights Act of 1866 and Section 16 of the

Voting Rights Act of 1870, which together prohibited discrimination based on race and alien status. Courts have consistently held that Section 1981 does not prohibit other types of discrimination (including, for example, discrimination based on national origin). Is Mr. Rajaram right that—notwithstanding this reluctance to extend Section 1981 beyond its Reconstruction-era purposes—the statute also prohibits discrimination based on U.S. citizenship?

## STATEMENT OF THE CASE

### I. Mr. Rajaram unsuccessfully applies to work at Facebook.

Purushothaman Rajaram was born and educated in India. 1-ER-99, 1-ER-104; AOB at 45 n.12. He is a U.S. citizen. 1-ER-99.

Mr. Rajaram is an engineer with experience in managing software products for big companies. 1-ER-104. He applied to work at Facebook (or Meta, the name Facebook adopted in 2021) at least four times between 2020 and 2022. 1-ER-104. Each time, Mr. Rajaram submitted a resume showing that he is a naturalized U.S. citizen. 1-ER-105–06. Despite allegedly receiving some positive initial feedback, Mr. Rajaram didn't get the jobs. 1-ER-105–06.

## II.   Mr. Rajaram sues Meta for allegedly discriminating against him and other U.S. citizens.

Mr. Rajaram brought a putative nationwide class action against Meta in May 2022.  1-ER-106, 1-ER-114.  He filed an amended complaint before Meta responded to the initial complaint.  1-ER-116.  In that amended complaint, Mr. Rajaram alleges that Meta "prefers to hire visa workers" instead of U.S. citizens "for certain positions."  1-ER-101. Mr. Rajaram's theory is that Meta prefers visa workers because it pays them "less than [their] American counterparts."  1-ER-101.  According to Mr. Rajaram, he was rejected "because of his citizenship."  1-ER-106.

Alleging what he calls "unlawful discrimination on the basis of citizenship," Mr. Rajaram has brought one claim against Meta, under Section 1981.  1-ER-108.  That statute provides, in relevant part:  "All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981.

## III.   The district court grants Meta's motion to dismiss.

Meta moved to dismiss Mr. Rajaram's amended complaint.  Its lead argument was that Section 1981 doesn't permit suits for discrimination on the basis of U.S. citizenship.  1-ER-85–88.  Meta explained that Section 1981 bars racial discrimination and discrimination against

aliens, but not discrimination on the basis of U.S. citizenship, and that courts have consistently declined to expand the scope of the statute. 1-ER-85. Meta also noted that several courts, including the Fifth Circuit, have specifically held that Section 1981 does *not* prohibit discrimination on the basis of U.S. citizenship. 1-ER-85–88 (citing, among other cases, *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir. 1986)). Meta argued that the complaint should be dismissed for other reasons as well, including that it lacks any factual allegations demonstrating that Mr. Rajaram would have been hired absent any supposed discrimination. 1-ER-91–93.

At the hearing on Meta's motion to dismiss, the district court explained that Section 1981 prohibits racial discrimination and discrimination based on alien status, "but citizenship doesn't seem to be a category supported by a plain reading of the text of Section 1981." 1-ER-18. The court then granted Meta's motion in a written order addressing only one of Meta's arguments—that Section 1981 doesn't permit claims for discrimination based on U.S. citizenship. The court followed the Fifth Circuit, "[t]he only appellate court to consider" that issue, as well as other district courts that have similarly held that Section

1981 doesn't permit suits over alleged discrimination on the basis of U.S. citizenship.  1-ER-12.

The district court explained that Section 1981 is a narrow, specific statute.  The text of the statute bars "discrimination based on race" and "discrimination based on alien status," but there is no basis for any protection against "discrimination based on U.S. citizenship."  1-ER-13–14.  The court further explained that "[t]he legislative history of the statute also supports this conclusion," as it demonstrates a focus on only race- and alienage-based discrimination.  1-ER-14.  "Through this lens, U.S. citizens are not a protected class under § 1981."  1-ER-14.

Because the district court concluded that Section 1981 doesn't authorize suits like this one, it didn't need to reach Meta's remaining arguments.  1-ER-10.  After the court entered judgment in favor of Meta, 1-ER-3, Mr. Rajaram filed a timely notice of appeal, 1-ER-111.

## SUMMARY OF ARGUMENT

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  That language prohibits discrimination on the basis of race.  It also prohibits discrimination on

the basis of alien status. But, as the district court correctly concluded, nothing in the statute's text or its legislative history says *anything* about treating U.S. citizens worse than aliens; it doesn't make U.S. citizens a protected class.

Section 1981 grew out of two Reconstruction-era laws enacted to combat discrimination against newly freed slaves in the South and Chinese laborers in the West. The first, enacted in 1866, permitted "citizens" to sue over racial discrimination in the formation and enforcement of contracts. The second, enacted in 1870, was designed to patch a gap in the first. Congress, concerned principally about new laws discriminating against Chinese laborers in California, permitted "all persons" to sue—not just citizens. In the floor debates over both measures, Congress addressed only discrimination based on race and alien status.

To enforce the 1870 statute, Congress passed an enforcement provision (the very next section in the act). It prohibited discrimination "on account of . . . being an alien." Act of May 31, 1870, ch. 114, § 17, 16 Stat. 140, 144. Congress said nothing about discrimination on account of being a citizen.

10

Mr. Rajaram says that Congress must have intended to prohibit discrimination on the basis of U.S. citizenship because it expressly permitted "all persons," a category into which U.S. citizens certainly fit, to bring suit. But the issue is not *who can sue* under Section 1981; potentially anyone in the country can. The question is what *types of claims* are permitted—i.e., whether Section 1981 permits a claim that the plaintiff was treated differently because he is a U.S. citizen. Nothing in the legislative history supports Mr. Rajaram's theory that it does. In neither 1866 nor 1870 did any member of Congress breathe a word about prohibiting discrimination on the basis of U.S. citizenship.

The notion that Section 1981 reaches that far also runs counter to a long line of cases construing the statute narrowly. Plaintiffs have for decades sought to expand the reach of the statute, but courts have consistently held that it doesn't prohibit other types of discrimination, including on the basis of national origin. *E.g.*, *Saint Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613 (1987). Discrimination on the basis of U.S. citizenship is no exception to this general rule, as the only court of appeals to address the issue has decided. *Chaiffetz v. Robertson Rsch. Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir. 1986).

11

Mr. Rajaram invites the Court to open a circuit split. In fact, he advances here not only the same *claim* that the Fifth Circuit repudiated in *Chaiffetz*—that Section 1981 forbids discrimination on the basis of U.S. citizenship—but the same *reasoning* that the Fifth Circuit rejected in that case. The theory is rooted in the Supreme Court's ruling in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976), which held that Section 1981 prohibits *all* discrimination on the basis of race, including against whites. *Id*. at 285. According to both the plaintiff in *Chaiffetz* and Mr. Rajaram, *McDonald* endorsed the idea that Section 1981 generally forbids "reverse discrimination." 798 F.3d at 735; AOB at 2, 4–5, 13–14, 17, 20, 21–22, 24–29, 41. The Fifth Circuit rejected that argument, explaining that Section 1981 targets discrimination only on the basis of two things: race and alien status. *Chaiffetz*, 798 F.3d at 735. Discrimination against white people is still *racial* discrimination, but discrimination on the basis of U.S. citizenship is not discrimination on the basis of alien status. *Id.* That holding is consistent with *McDonald*, where the Court held that Section 1981 forbids all discrimination on the basis of *race* (427 U.S. at 285); it didn't go further and endorse the idea

12

that the statute forbids discrimination on the basis of entirely different potentially protected characteristics.

If there were any doubt about the limited reach of Section 1981, a review of other anti-discrimination statutes would dispel it. Congress consistently makes clear what types of discrimination it is outlawing. Unlike in many other statutes, there is no long list of protected characteristics in Section 1981.

What's more, Congress has itself made clear that it never understood Section 1981 to forbid discrimination on the basis of U.S. citizenship. That's precisely why it prohibited, in the Immigration Reform and Control Act of 1986, discrimination against any "protected individual" in hiring "because of such individual's citizenship status"— with "protected individual" defined to include "a citizen . . . of the United States." 8 U.S.C. § 1324b(a). That statute doesn't create a private right of action. Instead, it authorizes those "adversely affected by an unfair immigration-related employment practice" to "file a charge" with the Department of Justice. *Id.* § 1324b(b)(1).

Congress has always had the power to amend Section 1981 to expand its reach. It has amended the statute, mostly recently in 1991 in

response to some recent Supreme Court decisions. Congress made substantive changes—for example, it made clear that Section 1981 applies to both private actors and the government—but it changed not a word of the language at issue in this appeal. In other words, despite decades of decisions interpreting Section 1981 to forbid only discrimination on the basis of race and alien status, Congress took no action to expand its scope.

Section 1981 is, and always has been, a narrow statute. As the district court correctly concluded, the statute doesn't make U.S. citizens a protected class. This Court should affirm the judgment.

## STANDARD OF REVIEW

This Court reviews an order granting a Rule 12(b)(6) motion to dismiss, including any questions of statutory interpretation it presents, de novo. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019).

## ARGUMENT

## I. Section 1981's text and history make clear that it prohibits only discrimination based on race or alien status.

Nothing in the text or legislative history of Section 1981 suggests that Congress intended to make U.S. citizens a protected class.

Mr. Rajaram's only textual argument—that the statute protects "all persons"—ducks the question presented by this appeal. The question is not *who* can sue under Section 1981, but *what* plaintiffs can sue about. *Sagana v. Tenorio*, 384 F.3d 731, 738 (9th Cir. 2004) ("The question of who can claim the protections of § 1981 is different from that which asks what protections it affords."). The text and history of the statute make clear that those protections are limited to discrimination based on race or alien status, not discrimination based on U.S. citizenship.

## A. Neither the statutory text nor the legislative history says anything about prohibiting discrimination on the basis of U.S. citizenship.

Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." The word "white" demonstrates Congress's focus on *racial* discrimination. And the beginning and the end of the sentence—which set up a comparison between the class of plaintiffs permitted to sue ("[a]ll persons") and the rights to which they're entitled (the rights of "citizens")—demonstrate that Congress also intended to bar discrimination on the basis of alien

status.  But nothing in the statute supports Mr. Rajaram's view that he can sue for discrimination on the basis of his U.S. citizenship.

The long history of Section 1981 confirms that its scope is limited to discrimination on the basis of race and alien status.  The statute is rooted in two major pieces of legislation passed by Congress during Reconstruction:  the Civil Rights Act of 1866, passed under the Thirteenth Amendment, and the Voting Rights Act of 1870, passed under the Fourteenth Amendment.  *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982).

Section 1 of the 1866 Act provided, in relevant part, that "citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right . . . to make and enforce contracts." Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27, 27.  The legislative history of the 1866 Act was similarly focused solely on race.  Senator Trumbull of Illinois, who authored the bill, explained that it was a response to a postbellum wave of official discrimination across the South:  "Since the abolition of slavery, the Legislatures . . . have passed laws relating to the freedmen, and in nearly all the States they have discriminated against them.  They deny them certain rights,

subject them to severe penalties, and still impose upon them the very restrictions which were imposed upon them in consequence of the existence of slavery, and before it was abolished."  Cong. Globe, 39th Cong., 1st Sess. 474 (1866).  He further explained that the "very object of the bill is to break down all discrimination between black men and white men." *Id.* at 599.  The bill "is simply intended to carry out a constitutional provision, and guarantee to *every person of every color* the same civil rights.  That is all there is to it.  That is the only feature of the bill, and all its provisions are aimed at the accomplishment of that one object." *Id.* at 599–600 (emphasis added).

Senator Trumbull was not the only one who made abundantly clear that the purpose of the bill that became the 1866 Act was to bar all varieties of race discrimination.  For example:

- Representative Wilson of Iowa, the bill's floor manager in the House:  "A colored citizen shall not, because he is colored, be subjected to obligations, duties, pains . . . This is the spirit and scope of the bill, and it goes not one step beyond."  Cong. Globe, 39th Cong., 1st Sess. 1117–18.

- Senator Howard of Michigan, who supported the bill: It "simply gives to persons who are of *different races or colors* the same civil rights." *Id.* at 504 (emphasis added).

- Senator Hendricks of Indiana, who opposed the bill: It "provides, in the first place, that the civil rights of all men, *without regard to color*, shall be equal." *Id.* at 601 (emphasis added).

Section 16 of the 1870 Act was very similar to section 1 of the 1866 Act, providing "[t]hat all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Act of May 31, 1870, ch. 114, § 16, 16 Stat. 140, 144. The big difference between the two laws was how they defined the class of people they protected. Whereas the 1866 Act protected "*citizens*, of every race and color," the 1870 Act protected "*all persons* within the jurisdiction of the United States."

This change from "citizens" to "all persons" was deliberate: Congress sought to expand the statute's protections to encompass discrimination based upon alien status. Newly freed slaves were not the only group facing discrimination immediately following the Civil War. Chinese immigrants arriving in the United States were also subject to

18

increasing resentment. *See generally* Charles J. McClain, Jr., *The Chinese Struggle for Civil Rights in Nineteenth Century America: The First Phase, 1850-1870*, 72 Cal. L. Rev. 529 (1984). From this resentment sprang new laws, particularly in California, including discriminatory taxes and a ban on testimony from Chinese immigrants in some California state courts. *Id.* at 535–40, 543–45, 548–53. In June 1869, a prominent Chinese merchant described these injustices to a congressional delegation visiting San Francisco. *Id.* at 564–65.

Moved by the plight of Chinese aliens, in January 1870, Senator William Stewart of Nevada introduced a bill "to secure to All persons the equal protection of the laws." Cong. Globe, 41st Cong., 2d Sess. 323 (1870). He explained that the 1866 Act "appl[ied] to citizens of the United States," and his new bill would "simply extend[] to foreigners, not citizens, the protection of our laws." *Id.* at 1536. Speaking in support of the new bill, Senator Stewart explained that its purpose was to "protect Chinese aliens or any other aliens whom we allow to come here." *Id.* at 3658. Senator Bingham of Ohio similarly explained that the aim of the bill was to eliminate discrimination against immigrants from certain countries: "the States shall not hereafter discriminate against the

19

immigrant from China and in favor of the immigrant from Prussia." *Id.* at 3871.

When Congress passed the 1870 Act, the provision protecting all persons (Section 16) was followed by an enforcement provision. Section 17 authorized imprisonment and a fine on anyone who, subjected "any inhabitant" of the country "to the deprivation of any right secured or protected by" Section 16 "on account of such person being an alien, or by reason of his color or race." § 17, 16 Stat. 140, 144. In other words, the same Congress that drafted the words at issue in this appeal made clear that they prohibited discrimination on the basis of alien status or race, but said *nothing* about discrimination on the basis of U.S. citizenship.

Section 1 of the 1866 Act and Section 16 of the 1870 Act were later combined and codified in Section 1977 of the Revised Statutes of 1874. *Runyon v. McCrary*, 427 U.S. 160, 169 n.8 (1976). Section 1977 was later recodified in 42 U.S.C. § 1981 with one non-substantive change (removing "in the United States" from the phrase "every State and Territory in the United States").

In sum, the text and long history of Section 1981 are clear. As a result of both the 1866 and 1870 Acts, the statute prohibits

discrimination on the basis of membership in any racial group. And, as a result of the 1870 Act, the statute also prohibits discrimination on the basis of alien status. Nothing in the text or history reflects a concern with preventing discrimination on the basis of U.S. citizenship.

## B. Mr. Rajaram's defense of his expansive reading of Section 1981 has no basis in the statute's text or history.

Mr. Rajaram's principal argument is that Section 1981 prohibits discrimination on the basis of U.S. citizenship because Congress must have intended to (1) protect U.S. citizens and (2) prohibit "reverse discrimination." AOB at 14, 24–33. But he fails to anchor his proposed expansion of the statute in its text or history. That is unsurprising; neither the language nor the legislative history of Section 1981 supports Mr. Rajaram's theory.

Mr. Rajaram observes (at 13, 22, 39) that Section 1981 *does* protect U.S. citizens. But that does not mean that U.S. citizens can sue for discrimination *on the basis of their citizenship*. "The question of who can claim the protections of § 1981 is different from that which asks what protections it affords." *Sagana*, 384 F.3d at 738. Meta does not dispute that "all persons," including U.S. citizens like Mr. Rajaram, may claim the protections of Section 1981. The question in this appeal is what

21

Section 1981 protects "all persons" *from*. In other words, although Section 1981 indisputably protects U.S. citizens, the question is whether it protects them *because* they are U.S. citizens. *See, e.g.*, *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973) ("The question . . . is not whether aliens are protected from illegal discrimination under [Title VII], but what kinds of discrimination [it] makes illegal.").

Nothing Mr. Rajaram cites in the legislative history of the 1866 act or the 1870 Act (AOB at 26–33) suggests that Congress was concerned about discrimination on the basis of U.S. citizenship. His quotations from the legislative record of the 1866 Act address only *who* was granted protection—potentially any citizen, of any race—not what they were protected *from*. *Id.* at 26–27, 30. And the same legislators he quotes made clear that this first postwar enactment was all about race:

- Senator Trumbull explained that the "very object of the bill is to break down all discrimination between black men and white men. . . . That is all there is to it. That is the only feature of the bill, and all its provisions are aimed at the accomplishment of that one object." Cong. Globe, 39th Cong., 1st Sess. 599–600 (1866).

- Representative Wilson said that "if all our citizens were of one race and one color . . . [t]his bill would be almost, if not entirely, unnecessary," but because that "is not the case, . . . we must do as best we can to protect our citizens, from the highest to the lowest, from the whitest to the blackest, in the enjoyment of the great fundamental rights which belong to all men." *Id.* at 1118.

- Representative Wilson sought to "put a stop to" the "[l]aws barbaric and treatment inhuman" that were "meted out by our white enemies to our colored friends." *Id.*

- Representative Lawrence echoed that view: "It is barbarous, inhuman, infamous, to turn over four million liberated slaves, always loyal to the Government, to the fury of their rebel masters, who deny them the benefit of all laws for the protection of their civil rights." *Id.* at 1833.

Nor does Mr. Rajaram identify anything in the text or history of the 1870 Act that demonstrates a congressional concern with preventing discrimination on the basis of U.S. citizenship. He concedes, as he must, that the "immediate concern" of the 1870 Act was the protection of Chinese immigrants (AOB at 31), but insists that the use of the phrase

"all persons" must have signified an intention to protect U.S. citizens as well (*e.g.*, AOB at 29). The trouble with that theory is that it has absolutely no support in the historical record. Mr. Rajaram's own quotations demonstrate that the purpose of the "all persons" language was to extend the protection of the 1866 Act "to Chinese aliens or any other aliens." *Id.* at 29. Mr. Rajaram doesn't cite a single statement showing that the bill that became the 1870 Act was meant to address anything other than discrimination on the basis of alien status. Nobody said anything about the distinct concept of discrimination on the basis of U.S. citizenship.

In short, the history of Section 1981 makes clear that it doesn't protect "all persons" against every type of discrimination. It was designed to permit suits over discrimination on the basis of race and alien status. "That is all there is to it." Cong. Globe, 39th Cong., 1st Sess. 599 (1866).

## II. Courts have consistently held that Section 1981 prohibits only discrimination based on race or alien status.

For decades, plaintiffs have argued that Section 1981 bars many different kinds of discrimination, but courts have consistently rejected that argument. And Mr. Rajaram offers no good reason why

discrimination based on U.S. citizenship is an exception to the rule that Section 1981 should be narrowly construed—or why this Court should open a circuit split by holding as much.

## A. Courts have interpreted Section 1981 and its predecessor statutes narrowly for over 150 years.

Courts interpreting Section 1981 have long held that it is narrowly focused on race and alien status, not a wide range of other characteristics. In several decisions, the Supreme Court has examined the legislative history of the 1866 Act and determined that it "clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality." *Georgia v. Rachel*, 384 U.S. 780, 791 (1966); *accord Gen. Bldg. Contractors Ass'n*, 458 U.S. at 384; *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976); *Runyon*, 427 U.S. at 168; *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436 (1968). And because of the 1870 Act, that protection "has been held to extend to aliens as well as citizens." *Graham v. Richardson*, 403 U.S. 365, 377 (1971); *accord Sagana*, 384 F.3d at 738–40; *Anderson v. Conboy*, 156 F.3d 167, 173–75 (2d Cir. 1998).

Litigants have for decades argued that Section 1981 protects against other kinds of discrimination too. But courts have consistently

rejected those theories. They have held, for example, that plaintiffs may not sue for discrimination on the basis of national origin because it isn't discrimination based on *race*. *E.g.*, *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *Zar v. South Dakota Bd. of Exam'rs of Psychs.*, 976 F.2d 459, 467 (8th Cir. 1992).

Courts have similarly held that plaintiffs may not sue under Section 1981 for discrimination on the basis of a wide range of other characteristics, even if they may be protected by other anti-discrimination statutes. *E.g.*, *Jones v. Bechtel*, 788 F.2d 571, 574 (9th Cir. 1986) ("section 1981 pertains to discrimination based on race, not discrimination based on sex"); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1123 (9th Cir. 2008) ("because § 1981 creates a cause of action only for those discriminated against on account of their race or ethnicity," allegations of harassment based on "sexual orientation" are "irrelevant"); *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1167 n.3 (9th Cir. 2007) ("It is well established . . . § 1981 does not apply to claims of religious discrimination."); *Sagana*, 384 F.3d at 738 (statute "does not protect against discrimination on the basis of . . . age"); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1411 (10th Cir. 1997) (statute "is concerned

26

with discrimination based on race and not on disability"); *Keating v. Carey*, 706 F.2d 377, 384 (2d Cir. 1983) ("§ 1981, however generously construed, does not prohibit discrimination on the basis of political affiliation").

In short, the courts have long interpreted Section 1981 in keeping with its narrow historical purposes—"forbid[ding] all 'racial' discrimination" and "provid[ing] protection for immigrant groups such as the Chinese." *St. Francis Coll.*, 481 U.S. at 613. Other classes may be protected by other statutes—but not Section 1981.

## B. Mr. Rajaram has given the Court no reason to depart from the judicial consensus that Section 1981 should be interpreted narrowly.

The question in this appeal is whether there is an undiscovered exception to this chorus of decisions holding that Section 1981 doesn't protect against discrimination except on the basis of race or alien status. According to Mr. Rajaram, there is. He insists that Section 1981 also forbids discrimination on the basis of U.S. citizenship. His argument turns almost exclusively on *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976), which he cites dozens of times. *E.g.*, AOB at 2, 4–5, 13, 20–23, 37, 41–42, 52. His argument proceeds as follows:

*McDonald* held that Section 1981's protection of "all persons" "extends to claims of reverse racial discrimination" (that is, discrimination against white people); Section 1981 also protects against discrimination against aliens; and the reverse of discrimination against aliens is discrimination against U.S. citizens. *E.g.*, *id.* at 21–22.

That argument misstates *McDonald*, has been rejected by the only court of appeals to decide the issue presented by this appeal, and finds support in only one thinly reasoned district-court decision.

>    **1. Mr. Rajaram's theory of the case depends on a "reverse discrimination" principle never embraced by Congress or the courts.**

There are at least three problems with Mr. Rajaram's theory of the case. The first is that Mr. Rajaram, like many Section 1981 plaintiffs before him, is mistaken about *how* the statute is broad. Yes, it permits "all persons" to sue, but not over anything under the sun.

The second is that in *McDonald*, the Supreme Court didn't establish a general rule that the statute permits "reverse discrimination" claims, as Mr. Rajaram says many times. *E.g.*, AOB at 22, 26. It decided only that Section 1981 is about race—and that the phrase on which Mr. Rajaram now leans, "as is enjoyed by white citizens," serves only to

28

"'emphasize the racial character of the rights being protected.'" 427 U.S. at 287, 293.

If there was any ambiguity in that language, the Court explained, it could be cleared up by reference to the legislative history, which shows that the bill that became the 1866 Act "was routinely viewed, by its opponents and supporters alike, as applying to the civil rights of whites as well as nonwhites." *McDonald*, 427 U.S. at 289. The Court devoted several pages of its opinion to quotations proving the point, including this one from the bill's author, Senator Trumbull: "This bill applies to white men as well as black men." *Id.* at 290. In seeking to justify his general reverse-discrimination rule, Mr. Rajaram points to no similar legislative history—because no one ever expressed any concern about the possibility of discrimination against U.S. citizens.

And the third problem with Mr. Rajaram's "reverse discrimination" theory is that although discrimination against white people *is* racial discrimination ("reverse" or otherwise), discrimination against U.S. citizens is *not* discrimination on the basis of alienage—as the only court of appeals to address the issue presented by this appeal has held. In *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731 (5th Cir.

1986), the plaintiff made all the same arguments as Mr. Rajaram. He claimed the defendant had discriminated against him in an employment decision "solely because he was an American." *Id.* at 732. And he offered the same exact interpretation of Section 1981 as Mr. Rajaram—that because the statute applies to aliens, and because the Supreme Court in *McDonald* held that it prohibits discrimination against whites, "'similar reverse discrimination against American citizens in favor of non-citizens is also proscribed.'" *Id.* at 735. The Fifth Circuit didn't buy it: "Discrimination against whites is racial discrimination, but (in America) discrimination against Americans can never be discrimination based on *alienage*. It can only be discrimination based on national origin," which can't be the basis of a claim under Section 1981. *Id.* at 735.

Without citing *Chaiffetz*, the Fifth Circuit reached the same conclusion in *Jatoi v. Hurst-Euless-Bedford Hospital Authority*, 807 F.2d 1214 (5th Cir. 1987). There, the foreign-born plaintiff "asserted he suffered discrimination based on alienage," but the court decided "[t]here is no foundation for this claim . . . because [he] is a United States citizen." *Id.* at 1219.

Several district courts have likewise decided that Section 1981 doesn't prohibit discrimination against U.S. citizens. *Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39, 49–50 (S.D.N.Y. 2020); *Maack v. Wyckoff Heights Med. Ctr.*, 2016 WL 3509338, at *15 (S.D.N.Y. June 21, 2016); *Tomason v. Stanley*, 2013 WL 5652040, at *3–4 (S.D. Ga. Oct. 16, 2013); *Vaughn v. City of New York*, 2010 WL 2076926, at *10 (E.D.N.Y. May 24, 2010).

These decisions rejecting the theory that U.S. citizens are a protected class under Section 1981 are correct and consistent with *McDonald* and other Supreme Court cases. And they demonstrate the fallacy of Mr. Rajaram's reliance on a principle of "reverse discrimination"—words not used in the decisions of the Supreme Court and this Court, and for good reason. The Court decided in *McDonald* that Section 1981 prohibits any and all discrimination on the basis of race—including, as in that case, discrimination against white people. In a later case, the Court made clear that "race" is an exceptionally broad category. *St. Francis Coll.*, 481 U.S. at 609–11. In the nineteenth century, when Section 1981's predecessor statutes were enacted, "race" was akin to ethnicity; as a result, many people who would be deemed to be of the same

race today—Germans and Finns, for example—were then regarded as belonging to separate "races." *Id.* at 611–12. So *McDonald* and *St. Francis College* aren't about "reverse discrimination"; they're about racial discrimination of *any* kind.

The 1870 Act, though, was different. It prohibited discrimination based on alien status, a protected characteristic that is meaningfully different from race. Everyone belongs to some race or another. But not everyone is an alien. Mr. Rajaram's theory would nonsensically expand any law prohibiting discrimination based on a protected characteristic that isn't shared by everyone. If Congress or a state legislature wants to protect only the elderly, we don't assume it also meant to protect young people. We don't read laws protecting the poor as also protecting the rich, or laws protecting the disabled as also protecting the able-bodied. So although Mr. Rajaram uses the phrase "reverse citizenship discrimination" dozens of times in his brief, there is no such thing. There is discrimination on the basis of alien status, and there is discrimination on the basis of an altogether different characteristic, U.S. citizenship.

In short, in enacting the laws that became Section 1981, Congress set out to prohibit race discrimination, which can happen to anyone, and

discrimination against aliens, which can happen only to aliens. As the Fifth Circuit correctly concluded, Congress didn't also aim to protect U.S. citizens from discrimination on the basis of citizenship.

### 2. There is almost no authority supporting Mr. Rajaram's theory of the case.

Mr. Rajaram cites a number of cases that, he argues, support his position. *E.g.*, AOB at 37–40. Not so: Only two of the decisions go his way, and one of those has no reasoning.

Mr. Rajaram argues that *Duane v. GEICO*, 37 F.3d 1036 (4th Cir. 1994), supports his "reverse discrimination" theory. *E.g.*, AOB at 22–23. But the facts of that case were the opposite of the facts here: The plaintiff was "not a United States citizen," and the Fourth Circuit held that he could maintain a Section 1981 claim against an insurer for refusing to write him a policy because of his alien status. 37 F.3d at 1037, 1044. Mr. Rajaram also claims that this Court has recognized claims of "citizenship discrimination." AOB at 47. But the memorandum disposition he cites, *Chattopadhyay v. BBVA USA*, 2021 WL 4958850 (9th Cir. Oct. 26, 2021), is like *Duane*: The plaintiffs there were "non-U.S. citizens," and they claimed that a bank discriminated against them on

the basis of their alien status by requiring only non-citizens to apply for new accounts in person, rather than online. *Id.* at *1.

Only one district court has endorsed any version of Mr. Rajaram's theory in a reasoned opinion. In *Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078 (D. Ariz. 2010), the district court denied a summary-judgment motion on a Section 1981 claim like Mr. Rajaram's for two reasons, neither of which is persuasive. First, it decided that *Chaiffetz* and other contrary decisions were wrongly decided because they supposedly turned on the term "alienage," which doesn't appear in Section 1981. *Id.* at 1086–87. But the statute also doesn't contain the word "race"; courts have nevertheless had no trouble concluding that's what it's all about. *Magana v. Northern Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997) ("Although the term 'race' does not appear in the statute, the [Supreme] Court has held that § 1981 provides a federal remedy against racial discrimination.").

Second, the court in *Jimenez* decided that Section 1981 can be invoked by "all persons" and that the Supreme Court held in *McDonald* that the statute generally protects against "reverse discrimination." 742 F. Supp. 2d at 1087. But the Court has never held that Section 1981

34

establishes some general principle of reverse discrimination, and its conclusion that Section 1981 protects all people from racial discrimination followed from the text of the statute and legislative history specifically addressing discrimination against white people. *McDonald*, 427 U.S. at 285–96; Part II.B.1, *supra*.

As for Mr. Rajaram's other cases, only one actually reaches the conclusion he claims. Citing *Jimenez* but adding no further analysis, a magistrate judge recommended the denial of a motion for summary judgment on a Section 1981 claim premised on supposed discrimination against a U.S. citizen. *Hernandez v. Siri & Son Farms, Inc.*, 2021 WL 4999022, at *7 (D. Or. Sept. 30, 2021).

Otherwise, none of the cases Mr. Rajaram cites addresses the question presented by this appeal. One dismissed a pro se complaint because it was not "apparent what, if any, Section 1981 claim" the plaintiff was pursuing. *Jones v. First Nat'l Bank of Ariz.*, 2010 WL 2491617, at *2 (D. Ariz. June 17, 2010). In two others, magistrate judges recommended granting summary-judgment motions on Section 1981 claims for lack of evidence, without first addressing whether Section 1981 applied in the first place. *Gomez v. Thrive Lifestyle Servs., LLC*, 2014 WL

4631201, at \*5–8 (D. Or. Sept. 15, 2014); *Murillo v. Servicios Agricolas Mex Inc.*, 2012 WL 1030084, at \*11–13 (D. Ariz. Mar. 27, 2012).

\*    \*    \*

In short, guided by the text and by the extensive record left by Congress during Reconstruction, courts have from the beginning interpreted Section 1981 narrowly. They have decided in case after case that Section 1981 protects against only discrimination based on race and alien status. As the district court correctly concluded, 1-ER-14, there is no reason to depart from that settled practice and to conclude that Section 1981 authorizes a new claim that has been lying hidden in plain sight for 150 years.

## III. Congress specifies the classes it means to protect in anti-discrimination statutes, and it has chosen to protect U.S. citizens only in other legislation, not Section 1981.

Mr. Rajaram speculates that Congress must have intended to draft a broad statute because a narrow one would, in his view, be bad policy. AOB at 33–37. And he says that a broad reading of Section 1981 is "consistent with other civil right[s] statutes addressing employment discrimination, which generally apply to claims of reverse discrimination." *Id.* at 37. But a review of other such statutes proves

36

that theory wrong. Congress doesn't prohibit discrimination vaguely or by implication; it specifically spells out which classes are protected by each anti-discrimination statute. And Congress knows how to prohibit discrimination on the basis of citizenship when it wants to. It did so, as Mr. Rajaram notes (AOB at 37), in the Immigration Reform and Control Act of 1986, which prohibits discrimination based on "citizenship status." 8 U.S.C. § 1324b(a)(1). Section 1981, by contrast, contains no such language, and there is no good reason for this Court to read it into the statute.

## A. Congress consistently specifies which classes it means to protect in civil-rights statutes.

Federal anti-discrimination laws aren't vague about what types of discrimination they prohibit. Take, for example, civil-rights statutes found throughout Title 42 of the U.S. Code. The Fair Housing Act prohibits refusing to sell or rent a house "because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Other subsections of that same statute prohibit discrimination not only for those reasons, but also on the basis of any "handicap." *E.g.*, *id.* § 3604(e). Title VI prohibits excluding anyone from any federally funded program because of "race, color, or national origin." 42 U.S.C. § 2000d. And the

37

Genetic Information Nondiscrimination Act goes so far as to prohibit discrimination against "any employee" "because of genetic information with respect to the employee." 42 U.S.C. § 2000ff-1(a)(1).

This sort of specificity is not limited to Title 42. The Equal Credit Opportunity Act prohibits discrimination against "any applicant" on the basis of a specific list of characteristics: "race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691. And the Equal Pay Act, cited by Mr. Rajaram (AOB at 37), forbids discrimination "between employees on the basis of sex." 29 U.S.C. § 206(d).

State legislatures, too, are specific about the types of discrimination they forbid. California, for instance, prohibits employment discrimination "because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, reproductive health decisionmaking, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of any person." Cal. Gov. Code § 12940(a).

Given this pervasive specificity in anti-discrimination laws, courts consistently decline to extend them to cover unenumerated classes. The Supreme Court has, for example, refused to read a prohibition on

38

discrimination on the basis of citizenship or alienage into Title VII, which makes it an unlawful employment practice to discriminate against "any individual" on the basis of "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1). *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 95 (1973). Likewise, courts have declined to extend the scope of section 1982—which provides that "[a]ll citizens" have the same rights to exchange property as "white citizens"—beyond racial discrimination. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968) (Section 1982 "deals only with racial discrimination and does not address itself to discrimination on grounds of religion or national origin."). That narrow interpretation of section 1982 informs the proper scope of Section 1981: "the Court has construed §§ 1981 and 1982 alike because it has recognized the sister statutes' common language, origin, and purposes." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 448 (2008).

## B. Congress expressly made U.S. citizens a protected class under another statute in large part because they aren't a protected class under Section 1981.

Given the specificity with which Congress prohibits various other types of discrimination, it should come as no surprise that Congress also knows how to prohibit discrimination against U.S. citizens when it wants

39

to. In the Immigration Reform and Control Act, or the IRCA, Congress expressly prohibited discrimination on the basis of U.S. citizenship. AOB at 37. The IRCA makes it "an unfair immigration-related employment practice" to discriminate against any "protected individual" in hiring "because of such individual's citizenship status." 8 U.S.C. § 1324b(a)(1). Congress erased any doubt about the IRCA's scope by defining the term "protected individual" to include "a citizen . . . of the United States." *Id.* § 1324b(a)(3)(A).

This Court has explained that the IRCA is unusual in prohibiting "employer discrimination based on citizenship status"; that is "a proscription not encompassed by other antidiscrimination statutes." *Gen. Dynamics Corp. v. United States*, 49 F.3d 1384, 1385 (9th Cir. 1995). In fact, it was *because* Congress concluded that Title VII and Section 1981 did not encompass discrimination based on U.S. citizenship that it enacted the IRCA's anti-discrimination provision in the first place. While debating the IRCA, Congress recognized that "[n]o Federal law now prohibits discrimination on the basis of citizenship status." H.R. Rep. No. 99-682, pt. 2, at 46 (1986); *accord, e.g.*, *Anti-Discrimination Provision of H.R. 3080: J. Hearing Before the H. Comm. on the Judiciary and the*

*Subcomm. on Immigration & Refugee Policy of the S. Comm. on the Judiciary*, 99th Cong. 61 (1985) (statement of Sen. Troy) (stating there was no law on the books providing protection against employment discrimination based on "[c]itizenship"); H.R. Rep. No. 682, pt. 1, at 70 (1986) (noting the same of Title VII).

In passing the IRCA, Congress observed that the Supreme Court's decision in *McDonald* is limited to discrimination on the basis of race. A report on alienage discrimination concluded that it was not "well settled" whether Section 1981 "provides a safeguard against discrimination on nonracial grounds" and that it "might provide protection only to persons who can claim that the nature of discrimination was based on racial or color characteristics." 131 Cong. Rec. S11434–35 (1985). This was exactly why Congress was debating whether to create a "new protected class" for U.S. citizens. *Anti-Discrimination Provision of H.R. 3080*, 99th Cong. 4 (1985).

Instead of expanding the scope of Section 1981 and authorizing private suits for discrimination by U.S. citizens, Congress chose to authorize only administrative proceedings under Section 1324b of the IRCA. *Gen. Dynamics Corp.*, 49 F.3d at 1385; *see also Biran v. JP*

*Morgan Chase & Co.*, 2002 WL 31040345, at *3 (S.D.N.Y. Sept. 12, 2002) (the IRCA doesn't create a private right of action). Mr. Rajaram could have filed a "charge" under the IRCA for the government to investigate. 8 U.S.C. § 1324b(b)(1). Instead, he brought this suit under a statute that doesn't protect against the kind of discrimination he alleges.

Mr. Rajaram is therefore wrong when he says that Congress has expressed in Section 1981 a "policy preference to broadly eliminate discrimination in employment, and to protect all citizens and all persons." AOB at 36. Congress prohibited discrimination against U.S. citizens only in the IRCA, which authorizes administrative proceedings; Congress declined to pursue the alternative of extending the reach of private suits under Section 1981 or Title VII. This suit therefore amounts to an attempted end-run around the administrative remedies authorized by Congress—whose eyes were wide open to the limitations of Section 1981. *See generally Anti-Discrimination Provision of H.R. 3080*, 99th Cong. 4 (1985). In other words, Congress seems to share Mr. Rajaram's view that discrimination against U.S. citizens should, as a policy matter, be actionable, AOB at 33–37—just not through lawsuits like this one.

In short, when Congress passes anti-discrimination laws, it makes clear what types of conduct are forbidden.  It did so in the IRCA by specifically prohibiting discrimination against anyone because he or she is a U.S. citizen.  It conspicuously *didn't* do that in Section 1981—which means that Congress never intended that statute to prohibit discrimination on the basis of U.S. citizenship.

## IV. Congress has had ample opportunity to expand the reach of Section 1981, but has declined to do so.

The limited reach of Section 1981 is no secret to Congress.  Since the statute was enacted, courts have interpreted it narrowly, rejecting invitations to read the statute to cover discrimination based on sex, religion, disability, and national origin, among other things.  Part II.A, *supra*.  In some of those cases, litigants have raised the precise issue presented by this appeal—whether Section 1981 prohibits discrimination based on U.S. citizenship—and courts have almost uniformly rejected it.  Part II.B, *supra*.  Notwithstanding the many decisions holding that Section 1981 is narrow—including some addressing the question presented here—Congress hasn't acted to expand the reach of Section 1981 to additional protected classes, including U.S. citizens.

Congress's inaction is not the product of inattention. On the contrary, Congress amended Section 1981 as recently as 1991 when it enacted the Civil Rights Act of 1991. Nothing in the amendment or the legislative history behind it suggests Congress was acting to expand the list of protected classes.

Section 101 of the Civil Rights Act of 1991 amended Section 1981 in response to two major court decisions. First, Congress sought to "overturn the Supreme Court's *Patterson* [*v. McLean Credit Union*, 491 U.S. 164, 171 (1989)] decision"—which held that Section 1981's prohibition against discrimination in "mak[ing] and enforc[ing] contracts" was limited to contract formation and enforcement—"by expanding the coverage of Section 1981 to include racial harassment on the job." 137 Cong. Rec. S3021 (1991); *accord id.* at S3026; *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372–73 (2004). Second, Congress "codifie[d] the holding of *Runyon v. McCrary*, 427 U.S. 160 (1976) under which section 1981 prohibits private, as well as governmental, discrimination." 137 Cong. Rec. H1665 (1991). Congress did not address the many decisions holding that Section 1981 doesn't bar most types of discrimination, including the Fifth Circuit's decisions specifically

addressing discrimination on the basis of U.S. citizenship. When Congress declines "to disturb a consistent judicial interpretation of a statute," that supports the inference that it "'acquiesces in'" and "'affirms'" that reading. *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988).

Given the limited purposes of the Civil Rights Act of 1991, Congress made no substantive changes to the original Section 1981. Instead, Congress placed that text in a subsection (1981(a)) and added two more subsections: 1981(b), which defines the phrase "make and enforce contracts," and 1981(c), which makes clear that the statute applies to private actors. Congress did not expand the list of reasons why "all persons" may sue.

In short, Congress has had ample time and opportunity to amend Section 1981 to make U.S. citizens a protected class. Its silence further confirms the statute's limits.

## CONCLUSION

This Court should affirm the judgment.


Dated: April 21, 2023                    Respectfully submitted,

                                         _____ s/ *Lauren R. Goldman* __
                                         Lauren R. Goldman

                                         *Attorneys for Meta Platforms, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief contains 9,063 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  The brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6).  I certify that this brief complies with the word limit of Circuit Rule 32-1.


Dated:  April 21, 2023                          ____s/ *Lauren R. Goldman*____
                                                    Lauren R. Goldman