No. 22-16870

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT


PURUSHOTHAMAN RAJARAM,

*Plaintiff-Appellant*,

v.

META PLATFORMS, INC.

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:22-cv-02920-LB
Magistrate Judge Laurel Beeler


**APPELLANT'S REPLY BRIEF**



Daniel Low
Daniel Kotchen
KOTCHEN & LOW LLP
1918 New Hampshire Ave. NW
Washington, DC 20009
dlow@kotchen.com
dkotchen@kotchen.com

*Attorneys for Plaintiff-Appellant*
*Rajaram*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................ii

ARGUMENT .......................................................................................... 1

I.    Section 1981's Broad Text Applies to Citizenship
Discrimination Against U.S. Citizens. ..................................... 1

II.   Legislative History Does Not Undermine the Unambiguous
Statute. ...................................................................................... 8

      A.    Legislative History Does Not Create Any Ambiguity... 9

      B.    Meta Misrepresents Section 17 of the 1870 Act.......... 11

      C.    Congress Specified Citizenship as a Type of Prohibited
Discrimination with No Exceptions. ............................ 12

      D.    Congress Favors Citizenship Discrimination
Protections for U.S. Citizens and Has Recognized
Section 1981 May Apply. ............................................. 15

      E.    Speculation About the Reasons for Congressional
Inaction Does Not Suggest a Different Statutory
Construction................................................................. 18

III.   The Authorities Relied on by Meta Are Not Persuasive....... 20

      A.    Section 1981 Applies to Race and Citizenship. ........... 20

      B.    Authorities Cited by Meta Are Not Grounded in
Statutory Text and Are Unpersuasive......................... 22

IV.   Meta Does Not Dispute the Public Policy Arguments
Favoring Rajaram. ................................................................. 25

CONCLUSION ...................................................................................... 25

i

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Conboy*, 156 F.3d 167 (2d Cir. 1998) .................................. 16

*Bhandari v. First Nat'l Bank of Commerce*, 829 F.2d 1343 (5th Cir. 1987) ...................................................................................... 16

*Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020) .................... *passim*

*Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979) ....................................... 18

*CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008) ............................. 14

*Chaiffetz v. Robertson Rsch. Holding, Ltd.*, 798 F.2d 731 (5th Cir. 1986) ........................................................................................ 22

*Chattopadhyay v. BBVA USA*, No. 21-15017, 2021 WL 4958850 (9th Cir. Oct. 26, 2021) ................................................................... 2, 21

*Duane v. GEICO*, 37 F.3d 1036 (4th Cir. 1994) ...................................... 5

*Georgia v. Rachel*, 384 U.S. 780 (1966) ................................................ 25

*Graham v. Richardson*, 403 U.S. 365 (1971)................................. 2, 3, 21

*Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir. 1974).... 16

*Jatoi v. Hurst-Euless-Bedford Hosp. Auth.*, 807 F.2d 1214 (5th Cir. 1987) ...................................................................................... 24

*Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078 (D. Ariz. 2010) ...................................................................................... 4

*Juarez v. Soc. Fin., Inc.*, No. 20-cv-03386-HSG, 2021 WL 1375868 (N.D. Cal. Apr. 12, 2021) ............................................................... 3

*Maack v. Wyckoff Heights Med. Ctr.*, No. 15 CIV. 3951, 2016 WL 3509338 (S.D.N.Y. June 21, 2016) ................................................. 23

*Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968 (10th Cir. 1979) ....... 6

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976) ..... *passim*

*Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39 (S.D.N.Y. 2020) .............................................................................. 23

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011) ........................................... 8

*Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330 (1988).................... 18, 19

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)............ 10

*Ortiz v. Bank of Am.*, 547 F. Supp. 550 (E.D. Cal. 1982)................... 6, 10

*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990)............ 18

*Rainwater v. United States*, 356 U.S. 590 (1958)............................. 15, 17

*Sagana v. Tenorio*, 384 F.3d 731 (9th Cir. 2004) ........................... *passim*

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ............................... 10

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948)....................... 2

*Tomason v. Stanley*, No. 6:13-CV-42, 2013 WL 5652040 (S.D. Ga. Oct. 16, 2013)........................................................................................ 23

*United States v. Classic*, 313 U.S. 299 (1941) ....................................... 12

*United States v. Otherson*, 637 F.2d 1276 (9th Cir. 1980)..................... 14

*United States v. Price*, 361 U.S. 304 (1960)..................................... 15, 17

*United States v. Williams*, 341 U.S. 70 (1951) ....................................... 14

*Vaughn v. City of N.Y.*, No. 06-CV-6547, 2010 WL 2076926 (E.D.N.Y. May 24, 2010) ................................................................................ 23

**Statutes**

16 Stat. 140 (1870).......................................................................... 7, 11, 12

18 U.S.C. § 242 ...................................................................................... 12

42 U.S.C. § 1981 .............................................................................. *passim*

42 U.S.C. § 1982 .................................................................................... 15

Civil Rights Act of 1866, 14 Stat. 27 (1866) ......................................... 15

**Other Authorities**

131 Cong. Rec. 23730, 99th Cong., 1st Sess. (Sept. 13, 1985) .......... 16, 17

132 Cong. Rec. 30001, 99th Cong., 2nd Sess. (Oct. 9, 1986).................. 17

Cong. Globe, 39th Cong., 1st Sess. (1866) ................................................ 17

Cong. Globe, 41st Cong., 2d Sess. (1870) ........................................... 11, 20

**Treatises**

Lorilyn Chamberlin, *National Origin Discrimination Under Section 1981*, 51 Fordham L. Rev. 919 (1983) ........................................... 10

## ARGUMENT

The question of whether § 1981 applies to citizenship discrimination against U.S. citizens is answered by the plain text of the statute and controlling prior interpretation of the statute. It is unnecessary – and inappropriate – to go beyond the unambiguous statutory text.

Appellee Meta Platforms, Inc. offers only a cursory interpretation of the statutory language that is contrary to § 1981's broad language and the controlling interpretation in *McDonald*. Meta devotes almost its entire brief to an examination of legislative history of the statute, including post-enactment legislative history, from which Meta would infer a different meaning of the statutory language than its plain text indicates. But "[j]udges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1754 (2020).

## I. Section 1981's Broad Text Applies to Citizenship Discrimination Against U.S. Citizens.

The two categories of discrimination addressed by Section 1981 are race and citizenship: "Just as the word 'white' indicates that § 1981 bars

1

discrimination on the basis of race, the word 'citizen' attests that a person cannot face disadvantage in the activities protected by § 1981 solely because of his or her alien status," *i.e.*, citizenship status. *Sagana v. Tenorio*, 384 F.3d 731, 738 (9th Cir. 2004); *see also Chattopadhyay v. BBVA USA*, No. 21-15017, 2021 WL 4958850, at *1 (9th Cir. Oct. 26, 2021) ("Plaintiffs have a legally protected interest in making contracts free of *citizenship discrimination* under Section 1981.") (emphasis added).

The Supreme Court has recognized that for categories of discrimination covered by § 1981, the language of the statute is broad, finding: "Congress [in Section 1981] . . . has *broadly provided*: 'All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts[] . . . as is enjoyed by white citizens.'" *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) (emphasis added) (quoting 42 U.S.C. § 1981(a)); *accord Graham v. Richardson*, 403 U.S. 365, 377 (1971) ("[Congress] has *broadly declared* [in § 1981]: 'All persons . . . .'") (emphasis added) (quoting 42 U.S.C. § 1981(a)); *Juarez v. Soc. Fin., Inc.*, No. 20-cv-03386-HSG, 2021 WL 1375868, at *6 (N.D. Cal.

2

Apr. 12, 2021) ("[Section] 1981's legislative history underscores that it was intended to apply *broadly*.") (emphasis added).

The broad "[a]ll persons" language means that the protections from discrimination based on citizenship status apply to citizens and non-citizens alike. Meta's Answering Brief ("MAB") at 21 (Dkt. 19) ("Meta does not dispute that 'all persons,' including U.S. citizens like Mr. Rajaram, may claim the protections of Section 1981."); *Graham*, 403 U.S. at 377 ("The protection of this statute has been held to extend to aliens as well as to citizens.").

Apparently recognizing the weakness of its textual argument, Meta's contrary analysis of the statutory language consists of a single paragraph of its 45-page brief, as follows:

> The word "white" demonstrates Congress's focus on *racial* discrimination. And the beginning and the end of the sentence—which set up a comparison between the class of plaintiffs permitted to sue ("[a]ll persons") and the rights to which they're entitled (the rights of "citizens")—demonstrate that Congress also intended to bar discrimination on the basis of alien status. But nothing in the statute supports Mr. Rajaram's view that he can sue for discrimination on the basis of his U.S. citizenship.

MAB at 15-16.

Meta's conclusion is a non-sequitur contradicted by the text of the statute and by controlling interpretations of the statute. "All persons" necessarily includes both aliens and U.S. citizens (which Meta does not dispute, *id.* at 3), and as Meta concedes, those persons are "entitled [to] the rights of 'citizens'" (*id.* at 15), *i.e.*, to be free from citizenship discrimination.

The Supreme Court in *McDonald* held based on the plain statutory language that because § 1981 gives "[a]ll persons" the same rights as "white[s]," § 1981 protects whites against race discrimination, as "[a]ll persons" necessarily includes "white persons." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976). Similarly, where the statute provides that "[a]ll persons" have "the rights of 'citizens'" (MAB at 15), Section 1981 protects U.S. citizens against citizenship discrimination, as "[a]ll persons" necessarily includes U.S. citizens. *Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078, 1086 (D. Ariz. 2010) ("As *McDonald* concluded that the plain language of Section 1981 prohibits discrimination against persons of all races, and not only non-whites, it is axiomatic that, Section 1981 prohibits discrimination against persons of all citizenships and not only non-Americans."); *see also Duane v. GEICO,*

37 F.3d 1036, 1038 (4th Cir. 1994) (finding prior Supreme Court interpretation of § 1981 controlling in construing statute).

Meta argues that Appellant Rajaram misrepresents *McDonald* as establishing a general rule that § 1981 applies to reverse discrimination claims, but that is not Rajaram's position. MAB at 28; Appellant's Opening Brief ("AOB") at 20-23 (Dkt. 6). Rather, *McDonald* interpreted the scope of racial discrimination provisions of § 1981 as applying to all groups, including whites, based on the statutory structure and language – *i.e.*, that "[a]ll persons" have the same rights as "white citizens." 427 U.S. at 287; *see also* MAB at 31 ("*McDonald* [held] that Section 1981 prohibits any and all discrimination on the basis of race"). The scope of the citizenship discrimination provisions of § 1981 involves interpretation of the same statutory structure and language, such that *McDonald*'s expansive interpretation is controlling where the Court held that the "[a]ll persons" language protects not only minorities, but also the benchmark groups against whom full rights are measured, i.e., "whites"

or "citizens,"[1] and the citizenship discrimination provision therefore applies to all groups, including citizens and non-citizens, prohibiting any and all discrimination on the basis of citizenship. 427 U.S. at 287; AOB at 22-23.[2]

"For protection against alienage [or citizenship] discrimination to be excluded from § 1981, the text would have to disclaim the citizenship distinction by comparing [e.g.,] 'all persons' to 'white persons.'" *Sagana*, 384 F.3d at 738. To disclaim citizenship discrimination claims by U.S. citizens but allow alienage discrimination claims, the statute would need to give "aliens" or "non-citizens" (rather than "[a]ll persons") the same rights as "citizens." But there is nothing in the statute that limits

---

[1] The "'rights and benefits of white citizens'" is the "'standard against whom the measure was to be made.'" *Ortiz v. Bank of Am.*, 547 F. Supp. 550, 563 (E.D. Cal. 1982) (quoting *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 970 (10th Cir. 1979)).

[2] While Meta concedes that Section 1981 "prohibits any and all discrimination on the basis of race—including . . . against white people" (MAB at 31), Meta offers no basis in the statute to undermine the conclusion that the "[a]ll persons" language also means that Section 1981 prohibits "any and all discrimination on the basis of" citizenship, including against U.S. citizens.

protections from citizenship discrimination to "aliens," "non-citizens," or to "alienage" discrimination – which are never referenced in the statute. *See* 42 U.S.C. § 1981(a). Rather, the statute more broadly protects "[a]ll persons" from "citizen[ship]" discrimination. *Id.*[3]

Meta argues that "nothing in the statute supports" application to "discrimination on the basis of [] citizenship." MAB at 16. But this ignores the statutory structure and text discussed above, and *McDonald*'s interpretation thereof. And the Supreme Court has rejected the argument that "Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception." *Bostock*, 140 S. Ct. at 1747.

Thus, Meta's interpretation is unsupported by the unambiguous plain language of the statute and is contrary to *Sagana* and to the

---

[3] By contrast, as discussed in Section II(B), *infra*, Section 17 of the 1870 Act protected persons from punishments under color of law "on account of such person being an *alien*, or by reason of his color or race" that were different than the punishments prescribed for citizens. § 17, 16 Stat. 140, 144 (1870) (emphasis added). Section 1981 contains no such limitation to discrimination "on account of such person being an alien," as opposed to discrimination based on citizenship. § 16, 16 Stat. 140, 144; 42 U.S.C. § 1981(a).

Supreme Court's controlling interpretation of the statutory language in *McDonald*.

## II. Legislative History Does Not Undermine the Unambiguous Statute.

 "Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011). "[L]egislative history can never defeat unambiguous statutory text[.]" *Bostock*, 140 S. Ct. at 1750.

In *Bostock*, for example, the Supreme Court extended Title VII's prohibition on sex discrimination to gay and transgender employees, rejecting extensive arguments about pre- and post-enactment legislative history, including the argument that Congress in 1964 would not have expected Title VII to apply to gay or transgender employees. *Id.* at 1747-54. The *Bostock* Court found that even though such application may have been unanticipated and was not specifically referenced in the statute or legislative history, it was encompassed within the broad language of the statute, and the statutory text was controlling. *Id.* at 1749-53.

Here, as in *Bostock*, the statutory text is unambiguous and renders legislative history irrelevant even if Congress did not explicitly anticipate application of the statute to protecting U.S. citizens from citizenship

discrimination.  *Id.*  Rather, § 1981's legislative history only serves to confirm the unambiguous statute.  *See* AOB at 24-33.  Section 1981 was enacted as part of landmark legislation with broad purposes.  *Id.* at 25-28.  And legislative history demonstrates that it was intended to broadly ensure equal protection to *all persons*, which includes citizens, from race and citizenship discrimination.  *Id.* at 28-31 (citing legislative history).

## A.    Legislative History Does Not Create Any Ambiguity.

The legislative history cited by Meta does not compel a meaning contrary to the plain text of the statute.  Meta argues only that the "legislative history [does not] say[] anything about prohibiting discrimination on the basis of U.S. citizenship."  MAB at 15 (heading (I(A)); *id.* at 23-24 (arguing that Congress's "use of the phrase 'all persons' [did not] signif[y] an intention to protect U.S. citizens" where legislative history does not explicitly say so).  For example, Meta points to statements in legislative history about the citizenship discrimination provisions of the 1870 Act being directed primarily at protecting Chinese immigrants. *Id.* at 19.

"But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of

our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *see also McDonald*, 427 U.S. at 295-96 (finding § 1981 applies to whites even though it was directly primarily at protecting freed slaves); Lorilyn Chamberlin, *National Origin Discrimination Under Section 1981*, 51 Fordham L. Rev. 919, 935 (1983) ("Courts and commentators alike have questioned the propriety of using 'the immediate concerns of Congress over one hundred years ago' to limit the scope of section 1981 today.") (quoting *Ortiz*, 547 F. Supp. at 555 n.7).

And Meta cannot point to any legislative history in which Congress indicated that § 1981 does *not* apply to citizenship discrimination against U.S. citizens – only legislative *silence* on the issue. MAB at 21. "But 'the fact that [a statute] has been applied in situations not expressly anticipated by Congress' does not demonstrate ambiguity; instead, it simply 'demonstrates [the] breadth' of a legislative command." *Bostock*, 140 S. Ct. at 1749 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)). Even if Congress had failed to anticipate application of § 1981 to citizenship discrimination against U.S. citizens, that does not undermine the statute's broad "[a]ll persons" language. *See id.* at 1750-

10

52 (rejecting argument that civil rights statute should not be applied to "unanticipated" or "unexpected" applications not referenced in legislative history where the new applications were encompassed within broad statutory text).

Moreover, legislative history indicates that Congress intended for § 1981 to provide equal protection to citizens. AOB at 28-33; *see also* MAB at 19 (acknowledging that the 1870 Act was introduced "'to secure to All persons the equal protection of the laws'") (quoting Cong. Globe, 41st Cong., 2d Sess., 323 (1870)).

## B. Meta Misrepresents Section 17 of the 1870 Act.

Meta misrepresents § 17 of the 1870 Act as criminalizing violations of § 1981 under color of law only "'on account of such person being an alien, or by reason of his color or race.'" MAB at 20 (quoting § 17, 16 Stat. 140, 144). In fact, however, Section 17 broadly criminalizes violating § 1981 under color of law, and separately criminalizes imposing greater punishments under color of law on aliens than the prescribed punishment for citizens, stating:

> [A]ny person who, under color of any law…shall subject…any inhabitant…to the deprivation of any right secured or protected by the last preceding section of this act [*i.e.*, Section 1981], ***or***

11

> *to different punishment, pains, or penalties on account of such person being an alien*, or by reason of his color or race, *than is prescribed for the punishment of citizens*, shall be deemed guilty of a misdemeanor[.]

§ 17, 16 Stat. 140, 144 (emphasis added), *codified as modified at* 18 U.S.C. § 242.

As the Supreme Court has explained, "the qualification with respect to alienage, color and race [in 18 U.S.C. § 242], refers only to differences in punishment and not to deprivations of any rights or privileges secured by [§ 1981 or other federal protections.]" *United States v. Classic*, 313 U.S. 299, 326 (1941).

Thus, contrary to Meta's argument, § 17 demonstrates only that when the 41st Congress in 1870 meant to limit the protections of a provision only to aliens and not U.S. citizens, it knew how to do so, e.g., by prohibiting the deprivation of a person's liberties "on account of such person being an alien." § 17, 16 Stat. 140, 144. Congress included no such limitation in § 1981(a).

### C. Congress Specified Citizenship as a Type of Prohibited Discrimination with No Exceptions.

Meta argues that federal anti-discrimination laws aren't vague about the types of discrimination they prohibit, that § 1981 isn't clear

about its applicability to reverse citizenship discrimination, and that §
1981 therefore does not apply to reverse citizenship discrimination. But
this is inaccurate. In *McDonald*, the Supreme Court held based on
almost identical text of § 1981 that the statute applies to racial
discrimination against whites (even though the statute did not explicitly
state that it applied to whites), and the *McDonald* Court's statutory
interpretation applies equally to citizenship discrimination against U.S.
citizens, which is prohibited based on the same statutory language. 427
U.S. at 286-87 (construing language of § 1981 that "'All persons . . . shall
have the same right[s] . . . as is enjoyed by white citizens'") (quoting 42
U.S.C. § 1981(a)).

Moreover, there is no "such thing as a 'canon of donut holes,' in
which Congress's failure to speak directly to a specific case that falls
within a more general statutory rule creates a tacit exception." *Bostock*,
140 S. Ct. at 1747. "Instead, when Congress chooses not to include any
exceptions to a broad rule, courts apply the broad rule." *Id.* In *Bostock*,
the Supreme Court extended Title VII to groups that were never
specifically mentioned in the statute or legislative history. *Id.* at 1750-
51.

13

While more recent anti-discrimination statutes may be more specifically worded, courts have cautioned against construing the language of reconstruction era laws like § 1981 too narrowly, as conditions during that period sometimes "'caused inadequate deliberation and led to loose and careless phrasing of laws.'"[4] *United States v. Otherson*, 637 F.2d 1276, 1283 (9th Cir. 1980) (quoting *United States v. Williams*, 341 U.S. 70, 74 (1951) (rejecting narrow interpretation of § 17 of the 1870 Act)).[5]

---

[4] Modern anti-discrimination laws tend to offer greater specificity than statutes passed in the reconstruction era. For example, Meta cites to statutes passed in the late 20th century or later, including those passed in 1963 (Equal Pay Act), 1964 (Title VI), 1968 (Fair Housing Act), 1974 (Equal Credit Opportunity Act), and 2008 (Genetic Information Nondiscrimination Act), which are more explicit than Section 1981 about the types of discrimination they prohibit. MAB at 37-38.

[5] Meta argues that the narrow scope of § 1982 "informs the proper scope of § 1981." MAB at 39 (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 448 (2008)). As the *CBOCS West* Court observed, § 1981 and § 1982 both have origins in § 1 of the Civil Rights Act of 1866. 553 U.S. at 448. But the operative statutory language of the original Act and the current versions of § 1982 and § 1981 diverged after the 1870 Act expanded the protections of what is now § 1981 to protect against citizenship discrimination. *Compare* Civil Rights Act of 1866, § 1, 14 Stat. 27, 27 (1866) (providing "citizens, of every race and color" the same contract and property rights "as is enjoyed by white citizens"), *with* 42 U.S.C. § 1982 (providing "[a]ll citizens" the same property rights as "white citizens"),

### D. Congress Favors Citizenship Discrimination Protections for U.S. Citizens and Has Recognized Section 1981 May Apply.

Meta argues that Congress made U.S. citizens a protected class under the Immigration Reform and Control Act ("IRCA") in 1986 "*because* Congress concluded that . . . Section 1981 did not encompass discrimination based on U.S. citizenship." MAB at 40. But "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one" – especially one from over a century earlier. *United States v. Price*, 361 U.S. 304, 313 (1960). And when a later statute is offered as "an expression of how the [later] Congress interpreted a statute passed by another Congress more than a half century before," "such interpretation has very little, if any, significance." *Rainwater v. United States*, 356 U.S. 590, 593 (1958).

In support of its argument, Meta cites, *inter alia*, a Congressional staff report from 1985 on alienage discrimination that concluded that it was not "well settled" whether § 1981 applies to discrimination on

---

*and* 42 U.S.C. § 1981 (providing "[a]ll persons" with the same contract rights as "white citizens").

nonracial grounds. 131 Cong. Rec. 23730, 99th Cong., 1st Sess. (Sept. 13, 1985)). The report cited to a Fifth Circuit case "for the proposition that '*an employment practice which discriminate(s) on the basis of citizenship is prohibited by section 1981*,'" but the report also observed that "a number of courts ha[d] held to the contrary." *Id.* (emphasis added) (quoting *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir. 1974), *overruled by Bhandari v. First Nat'l Bank of Commerce*, 829 F.2d 1343 (5th Cir. 1987)).[6] The report found as a "major drawback" of § 1981 the "absence of any administrative remedy." *Id.*

Thus, by enacting an administrative remedy in the IRCA, Congress was not motivated by the inapplicability of § 1981 where it acknowledged that § 1981 may apply, but by, *inter alia*, the absence of an administrative remedy.[7] *See also Bostock*, 140 S. Ct. at 1747 (finding post-enactment

---

[6] *Bhandari*, in turn, was superseded by statute, as stated in *Anderson v. Conboy*, 156 F.3d 167, 176 (2d Cir. 1998).

[7] Representative Jeffords stated that Title VII protects against national origin discrimination, and inaccurately stated that "[n]o Federal law now prohibits employment of discrimination on the basis of citizenship status." 132 Cong. Rec. 30001, 99th Cong., 2nd Sess. (Oct. 9, 1986) (quoted in MAB at 40). But his statement was inaccurate, as Section 1981 covers citizenship discrimination against aliens, as the Ninth

16

legislative history not probative where there was no authoritative evidence explaining why Congress adopted other laws addressing the protected category but didn't amend the existing statute); *Price*, 361 U.S. at 313 (finding post-enactment legislative history a "hazardous basis" for inferring intent); *Rainwater*, 356 U.S. at 593 (assigning "very little, if any, significance" to post-enactment legislative history).[8]

And as Meta concedes, the creation of an administrative remedy for U.S. citizens in the IRCA reflected Congress's policy preference that U.S. citizens should be protected from citizenship discrimination. MAB at 42.

---

Circuit subsequently recognized in *Sagana*, 384 F.3d at 737-38. Rep. Jeffords also observed that citizenship discrimination can violate Title VII if it has the purpose or effect of discrimination on the basis of national origin. 132 Cong. Rec. 30001.

[8] More instructive is contemporaneous debate, not legislative debate over a century later. For example, in response to the accusation of Senator Davis that the 1866 bill did not protect "the white man, . . . the citizen," Senator Trumbull stated that the accusation was "abominable" as the object of the bill "is to secure equal rights to all" and "declares that all persons in the United States shall be entitled to the same civil rights." *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess., 599 (1866).

**E.    Speculation About the Reasons for Congressional Inaction Does Not Suggest a Different Statutory Construction.**

Meta argues that Congress, through inaction, has implicitly accepted that § 1981 does not apply to citizenship discrimination against U.S. citizens.  But "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt."  *Bostock*, 140 S. Ct. at 1747 (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)).

In support of its argument, Meta relies on *Monessen Southwest Railway Co. v. Morgan*, which stated that "Congress' failure to disturb a *consistent judicial interpretation* of a statute may provide *some indication* that 'Congress at least acquiesces in, and apparently affirms, that [interpretation].'" 486 U.S. 330, 338 (1988) (emphasis added) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 703 (1979)).  The "consistent judicial interpretation" in *Monessen* existed where "federal and state courts ha[d] held with *virtual unanimity over more than seven decades* that prejudgment interest is not available under the FELA." *Id.* (emphasis added).

Meta points out that Congress amended § 1981 in 1991 "in response to two major court decisions" from the Supreme Court and argues that Congress could have also amended § 1981 to clarify whether it applies to citizenship discrimination against U.S. citizens. MAB at 44.

Here, however, there has not been "consistent judicial interpretation," such as decades of "virtual unanimity," nor has there been a major Supreme Court decision addressing the issue that would have been likely to elicit a response from Congress. Instead, there have been conflicting decisions from a handful of district courts and a single circuit court. AOB at 37-51 (discussing cases). These circumstances stand in stark contrast to *Monessen*, and do not provide any indication that Congress acquiesces in Meta's interpretation. *Monessen*, 486 U.S. at 338; *Bostock*, 140 S. Ct. at 1747.

In *Bostock*, Congress proposed but failed to pass proposed bills to add "sexual orientation" and "gender identity" to Title VII's categories of prohibited discrimination. 140 S. Ct. at 1755. The Supreme Court found that Congressional inaction was not probative of the meaning of the statute where there was "no authoritative evidence explaining why later Congresses adopted other laws referencing sexual orientation but didn't

amend [Title VII]." *Id.* at 1747 (extending Title VII to gay and transgender employees). "Maybe some in the later legislatures understood the impact Title VII's broad language already promised for cases like ours and didn't think a revision needed." *Id.*

Moreover, Meta concedes that "Congress seems to share Mr. Rajaram's view that discrimination against U.S. citizens should, as a policy matter, be actionable." MAB at 42. Thus, if the current Congress were to clarify whether § 1981 applies to reverse citizenship discrimination, it would likely determine that it does. This would be consistent with the views of the Congress that originally enacted § 1981, which stated that the law provides equal rights to all, including citizens, and was opposed to giving greater protections to minorities than white citizens. AOB at 26-31; Cong. Globe, 41st Cong., 2d Sess. at 1536 (explaining that 1870 bill was intended "to secure to all persons equal protection of the laws").

### III. <u>The Authorities Relied on by Meta Are Not Persuasive.</u>

#### A. **Section 1981 Applies to Race and Citizenship.**

Meta points out that courts interpret § 1981 to protect a narrow category of rights. MAB at 25. That is uncontroversial, as "[t]he text of §

1981 circumscribes the kinds of protections that may be claimed under its auspices," and therefore does not extend to, e.g., gender, religion, disability, age, or political affiliation. *Sagana*, 384 F.3d at 738. Rather, the statutory text offers protections only to race and citizenship discrimination where it refers to rights enjoyed by "white[s]" and rights enjoyed by "citizens." *Id.* ("'The protection of this statute has been held to extend to aliens as well as to citizens.'") (quoting *Graham*, 403 U.S. at 377; 42 U.S.C. § 1981(a); *see also Chattopadhyay*, 2021 WL 4958850, at *1 (stating that § 1981 applies to "citizenship discrimination").

While Meta concedes that the statute is broad in that it allows "all persons" to sue, Meta argues that Rajaram misstates *"how* the statute is broad" because the protected categories are narrow. MAB at 28. But the language of § 1981 makes clear that it protects against discrimination based on two categories: race ("white[s]") and citizenship ("citizens"), and the broad "[a]ll persons" language demonstrates that the citizenship discrimination protection applies to both aliens and U.S. citizens. 42 U.S.C. § 1981(a).

## B.  Authorities Cited by Meta Are Not Grounded in Statutory Text and Are Unpersuasive.

In his opening brief, Rajaram pointed out the flawed reasoning in a number of cases that Meta now relies on.  AOB at 40-51.  Meta attempts to rebut Rajaram's arguments about only one of those cases, *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731 (5th Cir. 1986). MAB at 29-30.  In *Chaiffetz*, the plaintiff implicitly conceded that § 1981 applies only to alienage discrimination, "characterizing his case as one involving 'reverse discrimination on the basis of *alienage*.'" 798 F.2d at 735 (emphasis added).  The court therefore examined only whether a U.S. citizen could assert an *alienage* discrimination claim (and not a citizenship discrimination claim more broadly).  *Id.* The court found that the plaintiff could not assert an alienage claim because U.S. citizens are not "aliens." *Id.*

Other cases relied on by Meta for the proposition that § 1981 does not apply to citizenship discrimination similarly failed to acknowledge the basis in the statutory language for applying § 1981 to citizenship discrimination. *See, e.g.*, *Tomason v. Stanley*, No. 6:13-CV-42, 2013 WL 5652040, at *4 (S.D. Ga. Oct. 16, 2013) (relying on *Chaiffetz* and not statutory language); *Vaughn v. City of N.Y.*, No. 06-CV-6547, 2010 WL

2076926, at *10 (E.D.N.Y. May 24, 2010) (relying on concession of plaintiffs and not statutory language); *Maack v. Wyckoff Heights Med. Ctr.*, No. 15 CIV. 3951, 2016 WL 3509338, at *15 (S.D.N.Y. June 21, 2016) ("Section 1981 proscribes discrimination on the basis of 'alienage,' *i.e.,* 'citizenship,'" but might not protect the plaintiff, who was a naturalized citizen, from discrimination in favor of natural born citizens); *Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39, 49-50 (S.D.N.Y. 2020) (relying on *Maack* and *Vaughn* and not statutory language).[9]

Meta next argues that "[w]e don't read laws protecting the poor as also protecting the rich." MAB at 32. But if the text of a statute offered protections to "all persons" based on a broad category related to wealth, e.g., "net worth" rather than "low net worth," then such statutory language would necessarily protect both high and low net worth individuals from discrimination based on net worth.

Meta cites several cases in its brief purportedly finding that § 1981 does not apply to citizenship discrimination claims of U.S. citizens. *Id.* at

---

[9] Meta does not attempt to defend the reasoning of the magistrate judge below, which Rajaram discussed at length. AOB at 40-51.

29-31.  Rajaram previously distinguished those cases (AOB at 43-51), with the exception that Rajaram did not previously address *Jatoi v. Hurst-Euless-Bedford Hospital Authority*, 807 F.2d 1214 (5th Cir. 1987). The *Jatoi* decision turned on the unique facts of the case, not on the legal issue of whether § 1981 prohibits discrimination against U.S. citizens. There, plaintiff Jatoi sought to assert a § 1981 alienage discrimination claim where U.S. citizens were allegedly favored and plaintiff "consider[ed] himself an East Indian." 807 F.2d at 1217, 1219.  But plaintiff was a naturalized U.S. citizen and therefore part of the allegedly *favored* group, and he therefore could not bring a citizenship discrimination claim as a disfavored alien.  *Id.* at 19.

Meta argues that, just as § 1981 protects against race discrimination even though it does not contain the word "race," § 1981 protects against alienage discrimination even though it does not contain the word "alien."  MAB at 34.  But the word "white" indicates that § 1981 applies to racial discrimination.  *McDonald*, 427 U.S. 287 (holding that the phrase "'as is enjoyed by white[s]'" "emphasiz[es] 'the racial character of the rights being protected'") (quoting 42 U.S.C. § 1981(a); *Georgia v. Rachel*, 384 U.S. 780, 791 (1966)).  And the word "citizens" similarly

24

indicates that § 1981 applies to *citizenship* discrimination. *Sagana*, 384 F.3d at 738.

## IV. <u>Meta Does Not Dispute the Public Policy Arguments Favoring Rajaram.</u>

In his opening brief, Rajaram explained that interpreting § 1981 as not protecting U.S. citizens from citizenship discrimination would be at odds with public policy concerns and therefore Congressional intent. AOB at 33-37. Meta makes no contrary policy arguments. Rather, Meta concedes that "Congress seems to share Mr. Rajaram's view that discrimination against U.S. citizens should, as a policy matter, be actionable[.]" MAB at 42.

## CONCLUSION

Because the statutory language is unambiguous, *McDonald*'s interpretation of the statute is controlling, and the legislative history is irrelevant in light of the unambiguous statutory language, the dismissal order of the magistrate judge should be reversed, the judgment vacated, and the case remanded for further proceedings.

Date: May 23, 2023

KOTCHEN & LOW LLP

*/s/ Daniel Low*
Daniel Low
Daniel Kotchen

*Attorneys for Appellant Rajaram*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32-1(b) because this brief contains 4,996 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally spaced typeface.

Date: May 23, 2023

KOTCHEN & LOW LLP

*/s/ Daniel Low*
Daniel Low
Daniel Kotchen

*Attorneys for Appellant Rajaram*